IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 123,097

STATE OF KANSAS,
*Appellee*,

v.

CARDELL TURNER,
*Appellant*.

SYLLABUS BY THE COURT

1.

Disagreements about trial strategy do not show a complete breakdown in communication between a defendant and counsel.

2.

If a defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma—the defendant has not shown the requisite justifiable dissatisfaction for substitute appointed counsel.

3.

When determining whether counsel's failure to advocate for an instruction supporting the defendant's only line of defense was prejudicial, a jury verdict that clearly reveals the jury would have rejected that defense and strong evidence cutting directly against that defense can inform the analysis.

1

4.

Disagreement with a judge's rulings cannot serve as the basis for a judge's recusal under K.S.A. 20-311d(d).

Review of the judgment of the Court of Appeals in an unpublished opinion filed October 28, 2022. Oral argument held September 14, 2023. Appeal from Sedgwick District Court; BRUCE C. BROWN, judge. Opinion filed February 2, 2024. Judgment of the Court of Appeals affirming the district court on the issues subject to review is affirmed. Judgment of the district court is affirmed on the issues subject to review.

*Peter Maharry,* of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant, and *Cardell Turner*, appellant pro se, was on the supplemental brief.

*Matt J. Maloney*, assistant district attorney, argued the cause, and *Marc Bennett,* district attorney, and *Derek Schmidt*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ROSEN, J.: On August 14, 2018, Alberto Alfaro and Enrique Umana Somoza were outside a home in Wichita trying to jump start Alfaro's truck. Cardell Turner pulled up beside them in his car, pointed a gun in the direction of Somoza and Alfaro, and pulled the trigger. The gun did not fire. Turner drove away, and no one was harmed. The State charged Turner with two counts of attempted first-degree murder and one count of conspiracy to commit murder in relation to this incident.

Prior to trial, Turner moved for new appointed counsel, alleging dissatisfaction with his counsel and a complete breakdown in communication. After two hearings, the district court denied the motion, reasoning that much of Turner's dissatisfaction came from Turner's unreasonable expectations and misunderstanding of the law. The case proceeded.

Turner testified in his own defense at trial. He told the jury he worked for a drug cartel in California and had been in Wichita to collect money from Alfaro and a man who worked locally for the cartel named Rogelio Velasquez. Turner collected the money from Velasquez upon his arrival in early August and then set his sights on Alfaro. Turner and Alfaro met in Topeka, but Alfaro did not have the money, so the two planned to meet again in a few days. Alfaro did not show up at the next scheduled meeting, so Velasquez told Turner where he might be able to find Alfaro. Velasquez also gave Turner a gun.

On August 14, Turner located Alfaro and Somozo trying to jump start a truck. Turner was on the phone with Velasquez at this time and reported the scene. Velasquez told Turner "when their heads are under [the hood], go do what you're going to do." Turner testified his plan was to "catch [Alfaro] in the low compromised . . . so [he could] approach him like, hey, what's up, man, like you got the money, you ready." Turner brought the loaded gun from Velasquez "in case something [went] down" but kept it in his lap.

Turner approached the two men in his car with his window rolled down and said, "'what's up." Turner testified Alfaro looked over his shoulder at Turner, turned away, and then spun around holding a gun. Turner then picked up his own gun and pointed it in the direction of Alfaro but "[could not] say it was pointed directly at him." Turner thought Alfaro was going to shoot, so he pulled the trigger on his weapon. Turner's gun malfunctioned and did not fire. Turner testified that the men began laughing at him and he drove away.

As he drove, Turner called Velasquez and told him the gun had malfunctioned. He also told Velasquez that Somoza had seen him and "might have to go too." Turner explained this was his way of letting Velasquez know the men had seen him and that

whatever happened to the men afterwards was "over [his] pay rate." Turner maintained throughout his testimony that he planned on getting the money from Alfaro and leaving, that he never intended to shoot or kill Alfaro, and that he only pulled his gun out of his lap and tried to fire because he thought Alfaro was going to shoot him.

Alfaro testified to a different version of events. He told the jury he never met with Turner and had not seen or heard of him prior to the day he pulled up outside of his house. Alfaro testified he had been trying to jump start his truck with a neighbor, Somoza, when Turner pulled up with his window rolled down. Turner asked, "what's up," Alfaro answered, then Turner asked, "what's right," pulled a gun up, and pointed it at Alfaro. Alfaro testified "what's right" means "bullets are about to start flying." Turner pulled the trigger three or four times, but it did not fire. Alfaro testified he told Turner to "get off" and Turner started screaming that he was going to kill Alfaro. Turner fiddled with the gun in an apparent attempt to get it working. Alfaro testified that, at this point, he thought it was a joke or a misunderstanding, so he started laughing. Turner drove off. Alfaro jump started his truck and tried to follow Turner to "see what's up," but did not catch up with him. Alfaro testified that neither he nor Somoza pointed a gun at Turner during the encounter. Somoza testified to a corroborating version of events.

An FBI agent testified at trial. He revealed that Velasquez had been the subject of a wiretap in August 2018 because he was suspected of engaging in drug distribution and money laundering. On August 12 or 13, the FBI began intercepting calls between Velasquez and Turner and learned that Turner was in Wichita looking for someone. Through testimony from the agent and playback of the recorded calls, the jury learned more about what was said on these calls. During the call that took place when Turner located Alfaro jump starting the truck, Turner told Velasquez he could "do nothing" because he was driving and there were too many people around. Turner said if he "had somebody who was driving then [he] could hit it . . . or [he] could follow him." The

4

recording confirmed that Velasquez told Turner, when Alfaro's head is under the hood, "do your thing" and then "jump on the motherfuckin' freeway." Turner again said there were too many people out there. The men speculated that once the subject got his truck started, he might go home. Velasquez told Turner that area was "kinda hot" and "too open." Agents interpreted this call to indicate an act of violence was going to occur.

Two minutes later, the FBI intercepted the call between Turner and Velasquez during which Turner said the gun had not worked and that he had been laughed at. About a half hour later, the FBI intercepted another call between the two men. Turner told Velasquez "that fat boy . . . might have to go too . . . cause he seen my face." Velasquez responded "yeah, both of y'all, fuck it."

The jury convicted Turner of one count of attempted first-degree murder for attempting to shoot Alfaro, one count of attempted second-degree murder for attempting to shoot Somoza, and one count of conspiracy to commit murder for conspiring to kill Alfaro. Following trial, Turner's counsel moved to withdraw because Turner claimed he had been ineffective, which led to a conflict of interest. Turner filed pro se a "motion to terminate ineffective counsel with request for new trial." The court granted the motion to withdraw and appointed Turner new counsel. After a hearing, the district court found trial counsel had not been ineffective and denied Turner's motion for new trial. Turner also filed many motions requesting the trial judge recuse himself, two pro se and one through counsel, and an affidavit in support. The court denied the motion submitted through counsel and the supporting affidavit. It sentenced Turner to 653 months' imprisonment for the attempted first-degree murder, 123 months' imprisonment for conspiracy to commit first-degree murder, and 61 months' imprisonment for the attempted second-degree murder, with the sentences to run consecutively.

Turner appealed his convictions and sentence. The Court of Appeals affirmed his convictions but vacated his sentence and remanded for resentencing because the district court miscalculated his criminal history score. *State v. Turner*, No. 123,097, 2022 WL 15527878, at *19 (Kan. App. 2022) (unpublished opinion). We granted Turner's petition for review of the portion of the panel's opinion affirming his convictions and the State's conditional cross-petition for review of the panel's holdings that a self-defense instruction was factually warranted and that defense counsel rendered deficient performance.

*Self-defense Instruction*

Turner argued in the Court of Appeals the district court clearly erred when it did not instruct the jury on the affirmative defense of self-defense. He claimed his testimony that he pointed a gun at Alfaro only after Alfaro first pointed one at him from close range permitted a rational fact-finder to find he had a subjective and objective fear for his life. The State argued self-defense was unavailable to Turner under the initial aggressor exception to self-defense in K.S.A. 2022 Supp. 21-5226(c) because even according to Turner's version of events, Turner initially provoked Alfaro by driving up to him with a gun in his lap and then did not exhaust every means of escape before turning to deadly force.

The Court of Appeals held the instruction would have been legally and factually appropriate, but the failure to offer it had not been clear error. The State challenges the conclusion the instruction was factually appropriate, and Turner challenges the conclusion it was not clear error when the court failed to offer the instruction.

We review claims of instructional errors in four steps.

> "First, the court considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, the court

6

applies an unlimited review to determine whether the instruction was legally appropriate; then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and, finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011)." *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023).

If the defendant did not request the instruction below, "the reviewing court applies the clear error standard . . . [and] determines whether it is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." *Bentley*, 317 Kan. at 242. It is the defendant's burden to establish reversibility "and, when examining whether the defendant has met that burden, the reviewing court makes a de novo determination based on the entire record." *Bentley*, 317 Kan. at 242.

The parties agree Turner did not request an instruction on self-defense, so we review for clear error.

The panel concluded the instruction would have been legally appropriate because self-defense is an applicable defense to attempted murder. *Turner*, 2022 WL 15527878, at *6. Neither party contests this conclusion. Their disagreements begin with the factual appropriateness of the instruction.

K.S.A. 2022 Supp. 21-5222 describes the right to use self-defense in the following manner:

"(a) A person is justified in the use of force against another when and to the extent it appears to such person and such person reasonably believes that such use of force is necessary to defend such person or a third person against such other's imminent use of unlawful force.

7

"(b) A person is justified in the use of deadly force under circumstances described in subsection (a) if such person reasonably believes that such use of deadly force is necessary to prevent imminent death or great bodily harm to such person or a third person."

This statute sets out a two-part test. The first part is a subjective one "and requires a showing that [the defendant] sincerely and honestly believed it was necessary to kill to defend herself or others." *State v. Qualls*, 309 Kan. 553, 557, 439 P.3d 301 (2019) (quoting *State v. McCullough*, 293 Kan. 970, 975, 270 P.3d 1142 [2012]). The second part of the test is objective "and requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary." *Qualls*, 309 Kan. at 557 (quoting *McCullough*, 293 Kan. at 975).

K.S.A. 2022 Supp. 21-5226 creates some exceptions to using self-defense. Relevant here, the statute makes self-defense unavailable to anyone who

"initially provokes the use of any force against such person or another, unless:

"(1) Such person has reasonable grounds to believe that such person is in imminent danger of death or great bodily harm, and has exhausted every reasonable means to escape such danger other than the use of deadly force . . . ." K.S.A. 2022 Supp. 21-5226(c).

Turner was entitled to a self-defense instruction so long as there was "'competent evidence'" to support it. *State v. Harris*, 313 Kan. 579, 592, 486 P.3d 576 (2021) (quoting 2020 Supp. K.S.A. 21-5108[c]). Competent evidence is "evidence that could allow a rational fact-finder to reasonably conclude that the defense applies." *Harris*, 313 Kan at 592.

8

The panel concluded Turner's testimony provided competent evidence Turner subjectively and objectively feared for his life when he raised his weapon and fired. The panel further concluded there was competent evidence that would support a finding the initial aggressor exception did not apply. It reasoned a rational fact-finder could find Turner did not initially provoke Alfaro and that even if he did, Turner had no other means to escape deadly force. 2022 WL 15527878, at *8.

The State argues the panel made two errors in its reasoning. First, it contends the panel erred in considering the evidence in a light most favorable to Turner because Turner did not request the instruction below. The State insists when an instructional error is unpreserved, appellate courts should not look at the evidence in a light most favorable to the defendant when considering the factual appropriateness of an instruction. The State argues this approach conflicts with what this court did in *State v. Williams*, 295 Kan. 506, 286 P.3d 195 (2012), with what it directed in *State v. Pulliam*, 308 Kan. 1354, 430 P.3d 39 (2018), and with the clear error standard in K.S.A. 2022 Supp. 22-3414(3).

We will not address the State's argument because it failed to advance it in the Court of Appeals. It hinted at it when it set out the governing law in its appellate brief by writing "[a] *requested* instruction relating to self-defense is factually appropriate if there is sufficient evidence, when viewed in the light most favorable to the defendant, for a rational factfinder to find for the defendant on that theory." (Emphasis added.) But the State did not ask the panel to review the evidence any differently in the case of an unrequested instruction or depart from the line of caselaw explaining that evidence is reviewed in a light most favorable to the defendant without distinguishing between requested and unrequested instructions. See, e.g., *State v. Lowry*, 317 Kan. 89, 96, 524 P.3d 416 (2023); *State v. Becker*, 311 Kan. 176, 183, 459 P.3d 173 (2020) (quoting *State v. Chavez*, 310 Kan. 421, 430, 447 P.3d 364 [2019]) (instruction is factually appropriate "if there is 'sufficient evidence, viewed in the light most favorable to the defendant or the

9

requesting party, that would have supported the instruction'"). We recently declined to review the same argument under similar circumstances. See *State v. Berkstresser*, 316 Kan. 597, 602, 520 P.3d 718 (2022) (argument that unrequested instructions should be reviewed in light most favorable to the State unpreserved and thus unreviewable when State only hinted at issue in Court of Appeals).

Next, the State argues the panel erred in concluding that, even when one considers the evidence in a light most favorable to Turner, a self-defense instruction was factually appropriate. It accepts the Court of Appeals conclusion there was competent evidence to support a finding Turner objectively and subjectively feared for his life. But it argues the panel erred in holding there was competent evidence to support a finding Turner was not an initial aggressor. The State reasons that, even according to his own testimony, Turner initially provoked Alfaro by driving up next to him with a gun in his lap and he did not try to escape before turning to deadly force.

The panel rejected this argument. It concluded a rational fact-finder could find Turner did not provoke Alfaro because there was evidence Turner's window was only halfway down and tinted very dark, meaning Alfaro could not see the gun in Turner's lap. *Turner,* 2022 WL 15527878, at *8.

The State acknowledges this evidence, but argues the panel erred because it ignored contradictory evidence that would make that an unreasonable finding. The State insists because Turner pulled up close to Alfaro and Somoza on the driver's side, the gun would have been visible to them.

This is unconvincing. The evidence could have supported a finding that Turner had a gun in his lap that was not visible to Alfaro or Somoza. It may have also supported a finding that the gun was visible, but that does not mean the instruction was factually

10

inappropriate. *State v. Holley*, 313 Kan. 249, 255, 485 P.3d 614 (2021), *on reh'g* 315 Kan. 512, 509 P.3d 542 (2022) ("A defendant's testimony, even if contradicted by all other witnesses and physical evidence, satisfies the defendant's burden as long as a rational fact-finder would reasonably conclude the defense applies."). We agree with the panel that the instruction would have been factually appropriate.

When an unrequested instruction would have been legally and factually appropriate, its absence amounts to clear error requiring reversal only if "the reviewing court . . . is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." *Bentley*, 317 Kan. at 242.

The panel concluded that the failure to instruct on self-defense was not clear error because the evidence against Turner was "overwhelming." *Turner*, 2022 WL 15527878, at *10.

Turner argues the panel erred because it did not consider how the weight of the evidence would have changed if the jury had been instructed on self-defense. Turner cites the evidence that Alfaro started laughing after Turner's gun did not fire and that Alfaro tried to follow Turner after he drove away. Turner argues that, had the jury been given the opportunity to consider self-defense, they would have relied on these facts to believe Turner's testimony. He insists the jurors would have also interpreted the phone calls between Turner and Velasquez as discussions about collecting money, not about killing someone, if it had been instructed on self-defense.

We disagree. Alfaro and Somoza testified they had no weapon. Velasquez told Turner, when Alfaro's head is under the hood, do "your thing" and then "jump on the motherfuckin' freeway." When Turner called Velasquez back after the gun misfired, he

11

told Velasquez the gun had malfunctioned, and that Somoza had seen him and "might have to go, too."

Like the Court of Appeals, we are not clearly convinced the result would have been different with a self-defense instruction. The absence of a sua sponte instruction on self-defense was not clear error.

*Substitute Counsel*

Before trial, Turner moved for new appointed counsel. After two hearings, the district court denied the motion. Turner appealed, and the panel affirmed.

This court reviews a district court's denial of a motion for substitute counsel for an abuse of discretion. The defendant bears the burden of establishing an abuse of discretion. *State v. Breitenbach*, 313 Kan. 73, 90, 483 P.3d 448, *cert. denied*, 142 S. Ct. 255 (2021).

The state and federal Constitutions guarantee a right to effective assistance of counsel. But they do not guarantee a criminal defendant the right to choose which attorney is appointed to represent them. *Breitenbach*, 313 Kan. at 90. Thus, if a defendant requests substitute appointed counsel, the defendant must show "'justifiable dissatisfaction' with appointed counsel." *Breitenbach*, 313 Kan. at 90 (quoting *State v. Sappington*, 285 Kan. 158, 166, 169 P.3d 1096 [2007]). Instances that may show "[j]ustifiable dissatisfaction include[] a showing of a conflict of interest, an irreconcilable conflict, or a complete breakdown in communications between counsel and the defendant." *Breitenbach*, 313 Kan. at 90 (quoting *Sappington*, 285 Kan. at 166). Ultimately, however, the court may refuse to appoint new counsel so long as it has "'a reasonable basis for believing the attorney-client relation has not deteriorated to a point

where appointed counsel can no longer give effective aid in the fair presentation of a defense.'" *Breitenbach*, 313 Kan. at 90. And, if a "defendant's dissatisfaction emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma— the defendant has not shown the requisite justifiable dissatisfaction" for substitute appointed counsel. *Breitenbach*, 313 Kan. at 90-91.

In the district court, Turner alleged his counsel was doing a poor job by failing to file certain motions, failing to amend Turner's charges, failing to investigate certain things, and failing to regularly communicate with Turner. Turner argued this had culminated in a breakdown of communication that made it impossible to carry on. Turner's counsel acknowledged he and Turner were no longer able to talk about the case but told the court it was because Turner refused to talk with him. The district court denied the motion and gave a thorough explanation as to why. Summarized, the court concluded Turner had unrealistic expectations of what an attorney did and that he would have the same complaints even with new counsel.

The Court of Appeals affirmed the district court's decision. It observed the district court based its ruling on a finding that counsel's representation was adequate. Thus, even if there was a complete breakdown in communication, that breakdown stemmed from Turner's unreasonable expectations and would not be remedied by new counsel. *Turner*, 2022 WL 15527878, at *4-5.

In his petition for review, Turner fails to discuss the Court of Appeals decision or point to any error in its analysis. He instead argues the district court was wrong when it concluded Turner would have the same complaints with new counsel. He asserts that his complaints and the breakdown in communication stemmed from trial counsel's lack of advocacy and thus, if he had new and zealous counsel, he would not have the same

13

complaints. He reasserts his position that counsel was inadequate because he failed to file motions to dismiss he said he would file, failed to investigate Turner's alibi defense, and failed to show Turner he was properly preparing the case.

We see no error in the panel's analysis. Turner fails to explain why a motion to dismiss was warranted or why counsel should have investigated an alibi defense when Turner admitted to being at the scene and trying to fire his weapon. Without some showing that these actions amounted to inadequate representation, they are fairly described as trial strategy, which is the "'exclusive province of the lawyer.'" *State v. Brown*, 305 Kan. 413, 426, 382 P.3d 852 (2016) (quoting *State v. Banks*, 216 Kan. 390, 395, 532 P.2d 1058 [1975]). And this court has held that disagreements about trial strategy do not "show a complete breakdown in communication." *Brown*, 305 Kan. at 426; see also *State v. Burnett*, 300 Kan. 419, 450-51, 329 P.3d 1169 (2014) (defendant had not shown justifiable dissatisfaction or that complaints would be remedied by new counsel when complaints stemmed from defense counsel's refusal to investigate matters or call witnesses defendant deemed important).

Turner also fails to offer any authority for his position that his attorney needed to "show [Turner] he was working for him and properly preparing the case" to provide effective representation. Moreover, he fails to explain what this would require and why it would be alleviated by a new attorney. We affirm the Court of Appeals decision to affirm the district court's denial of the motion for new appointed counsel.

*Ineffective Assistance of Counsel*

After the jury convicted Turner, Turner moved pro se for a new trial. He alleged, among other things, he was entitled to a new trial because his counsel had been ineffective when he failed to request a self-defense instruction. Newly appointed counsel

14

submitted a supplemental brief that advanced the same allegation. At a hearing, Turner's new counsel asked trial counsel why he had not requested a self-defense instruction:

"Q: And when you said that you didn't think you'd get a self-defense instruction, I think we're all generally familiar with the difficulty with that issue of self-defense instruction and the case law and how, on many occasions, the defense will argue for it and the Court will determine that it's not appropriate under the circumstances or the facts of the case and the Court just declines to give the instruction. And that was your determination that, based on the facts and circumstances here, it just wasn't gonna happen?

"A: That was my determination. If it was a mistake, it was a mistake."

The district court concluded defense counsel had not been deficient and denied the motion for a new trial. The court reasoned counsel was "very experienced, made decisions, employed a strategy, one that seemed to—in the poker analogy, to be the best one that could be done with the facts and circumstances." The court further ruled even if counsel had been deficient, any deficiencies could not have been prejudicial.

The Court of Appeals disagreed with the district court's reasoning. It held counsel's "failure to request a jury instruction on self-defense was objectively unreasonable." *Turner*, 2022 WL 15527878, at *13. But a majority of the panel affirmed the district court's ultimate ruling after concluding the instruction would not have made a difference given the "overwhelming evidence against [Turner]." 2022 WL 15527878, at *13.

Our standard for reviewing an ineffective assistance of counsel claim is well-known:

"In evaluating a claim of ineffective assistance [of counsel], courts apply a two-step test. First, they consider whether the defendant has shown that 'counsel's representation fell below an objective standard of reasonableness.' *Balbirnie* [*v. State*], 311 Kan. [893,] 897[, 468 P.3d 334 (2020)] (quoting *Strickland* v. *Washington*, 466 U.S. 668, 688, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]). If the defendant succeeds in making this showing, the next step requires the defendant show 'the deficient performance prejudiced the defense.' *Balbirnie*, 311 Kan. at 897." *State v. Dinkel*, 314 Kan. 146, 148, 495 P.3d 402 (2021).

In assessing prejudice, "'[j]udicial scrutiny of counsel's performance must be highly deferential, and a fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.'" *Dinkel*, 314 Kan. at 148 (quoting *State v. Betancourt*, 301 Kan. 282, 306, 342 P.3d 916 [2015]).

An appellate court uses a mixed standard of review in evaluating lower decisions on ineffective assistance of counsel. It "consider[s] whether substantial competent evidence supports the court's factual findings and review[s] the court's conclusions of law de novo." *Dinkel*, 314 Kan. at 148.

The State argues the Court of Appeals erred when it concluded defense counsel's failure to request a self-defense instruction was objectively unreasonable. The State's only argument is that a self-defense instruction was factually inappropriate, so it could not have been unreasonable when counsel did not request such an instruction.

We have concluded an instruction on self-defense was factually appropriate. This defeats the argument on which the State rests its position. We thus affirm the Court of Appeals conclusion defense counsel was deficient in failing to request a self-defense instruction and turn to the prejudice analysis.

16

The majority of the Court of Appeals concluded the deficient performance was not prejudicial because there was no reasonable possibility the failure to request a self-defense instruction affected the outcome of the trial, given the "overwhelming evidence" against Turner's defense. *Turner*, 2022 WL 15527878, at *13.

Judge Malone dissented on this issue. He opined that the failure to give the jury an avenue to apply Turner's defense was prejudicial, likening this case to *State v. Dinkel*, 314 Kan. 146. *Turner*, 2022 WL 15527878, at *19 (Malone, J., concurring in part and dissenting in part). In *Dinkel*, the State charged Dinkel with rape of a child under 14. Dinkel admitted to sexual intercourse with a child under 14 but argued in defense the alleged victim had initially raped her while she did nothing but lie motionless on a bed. This court held that defense counsel had been ineffective because they did not request an instruction on the voluntary act requirement, and without such an instruction, the jury had no way to apply Dinkel's defense. This court explained:

> "The failure to give the jury the tools it needed to apply Dinkel's defense against the State's case made it impossible to achieve the fundamental fairness we expect in a criminal trial. The instructions told the jury the State had to prove Dinkel knowingly engaged—meaning she was aware of her conduct—in sexual intercourse with K.H. between November and March while K.H. was less than 14 years old. Dinkel admitted to at least one instance of sexual intercourse with K.H. during this time. She also testified that K.H. forcibly raped her during their first sexual encounter while she just 'lied there' and presented evidence to support this claim. But no instruction told the jury that Dinkel was not guilty if she was forcibly raped. Because we generally presume juries follow instructions, *State v. Race*, 293 Kan. 69, 77, 259 P.3d 707 (2011), the absence of an instruction permitting the jury to apply Dinkel's defense was prejudicial. Without it, Dinkel's testimony secured her conviction for at least one of the charges.
>
> . . . .

"We conclude that Struble's deficient performance resulted in a 'breakdown in the adversarial process' and that, without this breakdown, the result would likely have been different.' *Strickland*, 466 U.S. at 696." *Dinkel*, 314 Kan. at 154-55.

Here, Judge Malone reasoned that "[a]s in *Dinkel*, Turner's counsel urged the jury to find Turner not guilty but offered them no avenue to do so. While counsel presented Turner's version of events to the jury, nothing in his arguments or the instructions told the jury how it could use that information to acquit him." *Turner*, 2022 WL 15527878, at *21 (Malone, J., concurring in part and dissenting in part).

Turner adopts the dissent's position. He also argues the panel erred in viewing the evidence against him as overwhelming. He contends the panel embraced the State's version of events without considering how else the evidence could have been interpreted.

At first blush, there are some similarities to *Dinkel*. The jury was instructed the State proved the charged crime if it proved Turner committed an overt act in furtherance of the premeditated and intentional killing of Alfaro. Turner admitted to lifting his gun, pointing it in the direction of Alfaro and Somoza, and pulling the trigger because he thought Alfaro was going to shoot him. In so doing, it would appear he effectively admitted to attempted first-degree murder. He argued his actions were justified as an act of self-defense. But, as in *Dinkel*, the jury here had no way to apply that justification when it was not offered a self-defense instruction.

But there are two distinguishing factors here that indicate the majority of the Court of Appeals was correct in concluding the presence of a self-defense instruction was not reasonably likely to change the outcome of the trial. The first difference lies in the jury verdict. In *Dinkel*, this court opined that a revealing jury verdict might inform the prejudice analysis. *Dinkel*, 314 Kan. at 154 ("We might also be able to conclude there

18

was no prejudice here if the jury's verdict could somehow show that the jury applied Dinkel's defenses even though it was never instructed to do so.").

The verdict in this case is enlightening. The jury convicted Turner of the separate offense of conspiracy to commit murder in the first degree. To find Turner guilty of this charge, the jury had to find:

1. The defendant agreed with another person to commit murder in the first degree.

2. The defendant did so with the intent that murder in the first degree be committed.

3. The defendant or any party to the agreement acted in furtherance of the agreement by sitting off the residence on South Greenwood, watching the victims, and then driving by and drawing a handgun and pulling the trigger multiple times.

4. This act occurred on or about the 14th day of August, 2018, in Sedgwick County, Kansas.

Thus, the jury found Turner agreed with another person to commit a murder and acted in furtherance of that agreement by going to Alfaro's, waiting, and pulling the trigger. This is inconsistent with the notion that Turner went to Alfaro's to collect money and only pulled the trigger in self-defense after a gun was pulled on him. If the jury had believed Turner's version of events, it seems likely they would have rejected the conspiracy charge.

19

Of course, it is difficult to predict what a jury will do. Cf. *State v. Barrett,* 309 Kan. 1029, 1039, 442 P.3d 492 (2019) (observing existence of jury nullification and inconsistent verdicts and their mitigating effect on complex cases). There may be an argument to be made that a robust presentation from defense counsel, coupled with a self-defense jury instruction, could have changed the jurors' minds.

But the second factor that distinguishes this case from *Dinkel* counters any unpredictability. As the Court of Appeals observed, there was a significant amount of evidence weighing directly against Turner's defense. Both Alfaro and Somoza testified that neither of them had a gun. And the calls between Turner and Velasquez suggested Turner was there to commit a murder.

In contrast, in *Dinkel*, there was evidence that supported Dinkel's claim that she did not voluntarily act and minimal evidence countering it. The defendant argued she had hired the alleged victim to do work around her house. She testified that one day, he pushed her down on a bed and held her there while he penetrated her vagina with his penis. She entered a Facebook message into evidence in which K.H. allegedly wrote that he had forced Dinkel into the first sexual encounter. *Dinkel*, 311 Kan. at 555. K.H. testified that he had never raped Dinkel, but no more evidence countered Dinkel's claim that she just lay on the bed while K.H. held her down. *State v. Dinkel*, No. 113,705, 2018 WL 1439992, at *8 (Kan. App. 2018) (unpublished opinion) ("K.H. denied ever raping Dinkel"), *rev'd* 311 Kan. 553, 465 P.3d 166 (2020).

This difference is significant because with evidence in support of Dinkel's testimony and minimal evidence countering it, there was a greater chance the jury would accept it if it had been given the tools to do so. But here, there was significant evidence

20

Turner did not act in self-defense. This makes it less likely a jury would accept his testimony and less challenging for an appellate court to assess possible prejudice.

Turner insists the evidence was not overwhelming. He focuses on the phone calls between himself and Velasquez, arguing that they never discussed homicide and could easily be interpreted as discussions regarding collecting drug money.

Turner is correct that neither party mentioned homicide on the phone calls. But neither party mentioned money, either. They also did not mention any failed attempts to collect money from Alfaro before the attempted shooting. And Turner's phone call to Velasquez immediately after he left Alfaro's never mentioned Alfaro having a weapon or a failed attempt to collect money. Turner told Velasquez only that the gun had not fired, and that Somoza would need to go, too, because he had seen Turner.

When determining whether counsel's failure to advocate for an instruction supporting the defendant's only line of defense was prejudicial, a jury verdict that clearly reveals the jury would have rejected that defense and strong evidence cutting directly against that defense can inform the analysis. Here, the weight of evidence cutting directly against Turner's defense, along with the jury verdict finding Turner guilty of conspiracy to commit first-degree murder, distinguish this case from Dinkel and show there was no reasonable possibility the verdict would have been different had the jury been instructed on self-defense.

We agree with the Court of Appeals that counsel's failure to request a self-defense instruction was not prejudicial.

*Motions for District Judge's Recusal*

After he was convicted and before sentencing, Turner filed three motions—two pro se and one through counsel—and an affidavit alleging the trial judge was biased against Turner and requesting the judge recuse. The motions were denied. The Court of Appeals affirmed.

This court exercises de novo review over whether a trial judge should have recused and whether the failure to do so warrants setting aside a district court judgment. *State v. Moyer*, 306 Kan. 342, 369, 410 P.3d 71 (2017).

There are "at least three possible bases for litigants to seek recusal of a trial judge: [1] the Kansas Code of Judicial Conduct, Supreme Court Rule 601B, Canon 2, Rule 2.2 (2013 Kan. Ct. R. Annot. 735); [2] K.S.A. 20-311d(c); and [3] the Due Process Clause of the Fourteenth Amendment to the United States Constitution." *State v. Moyer*, 306 Kan. at 370.

Turner cited all three bases as authority in seeking Judge Brown's recusal. The Court of Appeals held the district court did not err in denying the motions for recusal. We affirm that decision.

*Statutory Analysis*

K.S.A. 20-311d(a) permits a party to move for a change of judge. If that motion is denied, the party may file an affidavit alleging one or more of the grounds for disqualification listed in K.S.A. 20-311d(c), including when "[t]he party or the party's attorney . . . has cause to believe and does believe that on account of the personal bias, prejudice or interest of the judge such party cannot obtain a fair and impartial trial or fair

22

and impartial enforcement of post-judgment remedies." K.S.A. 20-311d(c)(5). The chief judge or another assigned judge should then determine "the legal sufficiency of the affidavit." K.S.A. 20-311d(b). K.S.A. 20-311d(d) provides that "the recital of previous rulings or decisions by the judge on legal issues . . . shall not be deemed legally sufficient for any belief that bias or prejudice exists."

On review of a judge's decision not to recuse under this statute, an appellate court "'must decide the legal sufficiency of the affidavit and not the truth of the facts alleged.'" *Moyer*, 306 Kan. at 371 (quoting *State v. Sawyer*, 297 Kan. 902, 908, 305 P.3d 608 [2013]). The appellate court decides "'whether the affidavit provides facts and reasons . . . which, if true, give fair support for a well-grounded belief that he or she will not obtain a fair trial.'" *Moyer*, 306 Kan. at 371 (quoting *Sawyer*, 297 Kan. at 908). The court considers "'whether the charges are grounded in facts that would create reasonable doubt concerning the court's impartiality, not in the mind of the court itself, or even necessarily in the mind of the litigant filing the motion, but rather in the mind of a reasonable person with knowledge of all the circumstances.'" *Moyer*, 306 Kan. at 371 (quoting *Sawyer*, 297 Kan. at 908).

After the district court denied Turner's motion for the judge's recusal, Turner filed an affidavit supporting the request for recusal in accordance with K.S.A. 20-311d(a). He argued the judge had been biased and prejudicial against him and this prejudice and its effect was evident in the judge's decisions allowing the State to introduce "fatally tainted" evidence, allowing improper jury instructions, denying the motion for new counsel, and in the judge's habit of cutting Turner off when he was talking in a way that made Turner feel "belittled," "threatened and intimidated."

The district judge assigned to consider the affidavit concluded that disagreement with the judge's rulings and any irritation the judge showed towards Turner could not

demonstrate judicial bias or prejudice. It also ruled that the fact the judge required Turner to quit talking and present his defense through trial counsel could not show bias or prejudice. Thus, the district court concluded the affidavit was legally insufficient to force the judge's recusal.

The Court of Appeals agreed with the district court's conclusions that disagreement with a ruling is not legally sufficient to show bias or prejudice. The panel further concluded that cutting Turner off after asking him to speak could not show bias because a judge has broad discretion in controlling a courtroom. *Turner*, 2022 WL 15527878, at *14.

We conclude the panel made no error in affirming the district court's decision that Turner's affidavit was not legally sufficient to warrant the district judge's recusal under K.S.A. 20-311d. The panel's conclusion that disagreement with rulings cannot serve as the basis for recusal is sound. See *Sawyer*, 297 Kan. at 908 (declining to consider disagreements with district court's rulings in recusal analysis because "[a]dverse legal rulings alone cannot form the basis for a recusal") (citing K.S.A. 20-311d[d]).

That leaves only Turner's complaints about the judge cutting him off in a way that made him feel belittled or threatened. But the panel persuasively pointed out that judges have great leeway in controlling a courtroom. See *State v. Kemble*, 291 Kan. 109, 114, 238 P.3d 251 (2010) ("'a trial court must control the proceedings in all hearings and trials and . . . has broad discretion and leeway in doing so'"). Without more details about these incidents or why they went beyond a judge's responsibility to direct parties when to speak, the bare facts provided in the affidavit are legally insufficient to force a judge's recusal under the statute. See *Sawyer*, 297 Kan. at 908 (allegations in affidavit that judge prevented pro se pleadings and ordered defendant transported gag in place were not,

24

without more detail, legally sufficient to force recusal because this is not always unjustified).

*Code of Judicial Conduct Analysis*

Kansas Supreme Court Rule 601B, Canon 2, Rule 2.2 provides: "A judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially." (2023 Kan. S. Ct. R. at 493). Canon 2, Rule 2.11 provides: "A judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned, including . . . (1) The judge has a personal bias or prejudice concerning a party or a party's lawyer . . . ." (2023 Kan. S. Ct. R. at 499.)

A motion for recusal under the Judicial Code of Conduct is not constrained by the statutory prohibition on relying on adverse rulings to move for a judge's recusal under K.S.A. 20-311d. See K.S.A. 20-311d(d) (prohibiting "affidavit filed pursuant to this section" from relying on previous rulings or decisions to show bias). Nonetheless, Turner has failed to show the rulings in this case showed bias or prejudice against him. He complains about the judge's admission of evidence, denial of motion for new counsel, refusal to rule on pro se motions, jury instruction on intent, and imposed sentence. But review of the record suggests there was no bias influencing these decisions. The judge did not rule on pro se pleadings other than ineffective assistance of counsel claims because Turner was continually represented by counsel. And all the rulings, including sentencing, were offered after arguments from both sides and with the judge's consideration of the applicable law. While the judge's decision to run all three sentences consecutively added time to what the State recommended, this was within the court's discretion to do.

25

Furthermore, the district judge's efforts to stop Turner from speaking do not show a bias or prejudice against Turner. While some of the judge's comments may have showed some irritation, review of the entire record reveals that the comments to which Turner appears to refer were isolated, did not represent the judge's usual or general demeanor, and were precipitated by regular interruptions from Turner. The few comments to which Turner points to would not cause a reasonable person to believe the judge could not act impartially. There are many instances throughout the record during which Judge Brown showed great patience with Turner and his repeated attempts to address the court and discuss his legal arguments. Turner has failed to show that the judge's conduct and rulings would make a reasonable person question his impartiality and require recusal under the Code of Judicial Conduct.

*Due Process Analysis*

The Due Process Clause of the Fourteenth Amendment "guarantees 'an absence of actual bias' on the part of a judge." *Williams v. Pennsylvania*, 579 U.S. 1, 8, 136 S. Ct. 1899, 195 L. Ed. 2d 132 (2016) (quoting *In re Murchison*, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 [1955]). Because "bias is easy to attribute to others and difficult to discern in oneself," the Supreme Court applies "an objective standard that . . . asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is "likely" to be neutral, or whether there is an unconstitutional "potential for bias."'" *Williams*, 579 U.S. at 8 (quoting *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 881, 129 S. Ct. 2252, 173 L. Ed. 2d 1208 [2009]).

The Supreme Court has identified at least four instances when that would be the case:

"when a judge has a direct, personal, substantial pecuniary interest in the case; when a judge has an indirect financial interest in the case's outcome; when a judge issues a

26

contempt citation in one case and proceeds to try the contempt citation; and, in rare instances, when a litigant donates to a judge's campaign for office." *Sawyer*, 297 Kan. at 909.

The Supreme Court has held that, if the failure to recuse violates due process because the potential for bias was unconstitutionally intolerable, the error was structural and thus not subject to harmless error review. *Williams*, 579 U.S. at 15-16.

This court has previously expressed the test under due process differently, asking "'whether the judge had a duty to recuse from the case because the judge was biased, prejudiced, or partial" and, if so, "whether the judge's failure to recuse resulted in actual bias or prejudice.'" *Moyer*, 306 Kan. at 375-76 (quoting *Sawyer*, 297 Kan. at 909). But it has acknowledged that the accuracy of this test is questionable and may need to be revisited. *Moyer*, 306 Kan. at 376; *Sawyer*, 297 Kan. at 909. In neither case, however, did this court need to revisit the test. In *Sawyer*, the defendant showed an objectively intolerable potential for bias, thus satisfying the Supreme Court's due process standard requiring recusal. 297 Kan. at 911-12. And in *Moyer*, the defendant failed to show recusal was necessary under either test. 306 Kan. at 376.

This case is like *Moyer*. Turner has not alleged that any of the four circumstances identified by the Supreme Court as objectively requiring recusal were present in this case. Nor has he pointed to other facts that would suggest the "objective risk of actual bias" on the part of the judge" rose to an unconstitutional level. See *Caperton* 556 U.S. at 886. He has pointed only to rulings and comments from the judge that he claims showed an actual bias. Even if this court's previously used due process test, which requires recusal upon a showing of actual bias, is still viable, we have concluded Turner has not shown actual bias. Thus, his due process claim fails.

27

We affirm the Court of Appeals conclusion there was no error when Judge Brown did not recuse.

*Cumulative Error*

Turner argues even if the errors he alleges did not individually require reversal, they worked collectively to deny him a fair trial.

> "'The test for cumulative error is whether the errors substantially prejudiced the defendant and denied the defendant a fair trial given the totality of the circumstances. In making the assessment, an appellate court examines the errors in context, considers how the district court judge addressed the errors, reviews the nature and number of errors and whether they are connected, and weighs the strength of the evidence. . . . If any of the errors being aggregated are constitutional, the constitutional harmless error test of *Chapman* applies, and the party benefitting from the errors must establish beyond a reasonable doubt that the cumulative effect of the errors did not affect the outcome. . . . Where, as here, the State benefitted from the errors, it has the burden of establishing the errors were harmless.' *State v. Thomas*, 311 Kan. 905, 914, 468 P.3d 323 (2020)." *State v. Brown*, 316 Kan. 154, 172-73, 513 P.3d 1207 (2022).

The Court of Appeals identified two errors in its cumulative error analysis: defense counsel's failure to request a self-defense instruction and the trial court's failure to sua sponte instruct the jury on self-defense. Because these both dealt with the failure to get a self-defense instruction in front of the jury, the panel counted this as one error and held the cumulative error doctrine did not apply. It further held the doctrine did not apply because the evidence against Turner was overwhelming, citing *State v. Hilt*, 299 Kan. 176, 200, 322 P. 3d 367 (2014). *Turner*, 2022 WL 15527878, at *15.

Turner does not allege any error with the panel's decision to count its identified errors as one. He argues the panel's analysis is off because there were additional errors to

28

aggregate. But we have rejected Turner's two additional claims of error. Thus, Turner's cumulative error argument fails and we affirm the panel's conclusion.

Judgment of the Court of Appeals affirming the district court on the issues subject to review is affirmed. Judgment of the district court is affirmed on the issues subject to review.