NOT DESIGNATED FOR PUBLICATION

No. 125,867

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

PERNELL ADAM MACK,
*Appellant*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; JASON E. GEIER, judge. Argument held October 15, 2024. Opinion filed January 24, 2025. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant.

*Jodi Litfin*, deputy district attorney, *Michael F. Kagay*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before COBLE, P.J., GARDNER, J., and CARL FOLSOM III, District Judge, assigned.

PER CURIAM: In April 2020, Pernell Mack was charged with various crimes for a violent attack that had occurred 17 years earlier. A jury found Mack guilty as charged. He now appeals, challenging various aspects of his trial. After careful review of the record, we affirm.

1

*Factual and Procedural Background*

In April 2020, Pernell Mack was charged with rape, aggravated criminal sodomy, aggravated kidnapping, aggravated robbery, and aggravated burglary for a violent attack that occurred in Topeka 17 years before.

The victim (referred to under the pseudonym Jane) testified that in 2003, on the day of the attack, she had been cleaning her sister's house in anticipation of moving in. She left the house around 7 p.m. and returned around 3 a.m. When she was about three-quarters of the way inside the house, she saw a man in the kitchen. He immediately "knocked [her] out of the way," shut the door, and turned off the lights. Jane then saw another man—Mack—running at her from the hallway. One man put Jane in a chokehold, pressed a gun to her temple, and began asking where "Jeff" was. Jeff was her sister's boyfriend, and apparently owed these men money.

After unsuccessful attempts to find Jeff or Jane's sister by phone, the two men ordered Jane to get undressed. The other man grabbed Jane and pushed her down the hall toward the bedroom then into the bathroom, and Mack followed. The men forced Jane into the bathtub and told her to call her sister again. The other man said that if Jane told her sister that the men were there, he would kill her. Jane called her sister and convinced her to come to the house. The entire time Jane was on the phone, the other man repeatedly bumped the gun against her head. Both men then physically and sexually assaulted Jane in multiple ways in the bathroom. We omit the lurid details, as they are not necessary to the issues on appeal.

Jane remained in the bathtub when the two men left to talk in the living room. Mack then returned to tell Jane to comply with everything the other man told her to do or else she "wouldn't be okay." A few minutes later, Jane heard the men leave so she left the

2

bathroom and called 911. When police arrived, Jane told them what had happened and was taken to the hospital.

The nurse who examined Jane at the hospital testified that she had several injuries, including soreness around the neck, an abrasion on her shoulder, several swollen places on her head, and redness on her back. The nurse also testified that Jane had injuries that were consistent with sexual intercourse.

The police officer who arrived at the scene testified that he collected a used condom from the bathroom floor as well as one from inside the toilet. He also collected the bathroom rug, which had a wet spot on it. These items were later tested for DNA evidence. Police interviewed several possible suspects and investigated several leads, but the case eventually went cold. And it remained that way for 17 years.

Then in 2020, the KBI received a sample of Mack's DNA, which had been taken in another case, and purportedly matched the DNA profile from the 2003 crime. Mack's DNA was collected again, and his DNA profile matched the DNA from the used condom left on the bathroom floor years earlier, which also had Jane's DNA on it. Mack's DNA profile, however, did not match the DNA from the stain on the rug.

A detective with the Shawnee County Sheriff's Office who had interviewed Mack several times during the 2020 investigation testified that Mack's defense had changed several times. For example, Mack had initially denied ever being at the sister's house but later admitted that he had been there several times to have sex with two women—Jane's sister and a woman named Sarah M. Mack later told the detective that Sarah had "set him up" and that several people could corroborate this defense.

The detective testified that Sarah had been mentioned as a "person of interest" and was interviewed in 2003, but they determined she was not involved in the incident. The

detective also said he had interviewed most of the people that Mack said could corroborate his defense, but he was unable to locate one of them. None of these people corroborated Mack's defense, either when speaking to the detective or when testifying at trial.

The detective also testified that shortly before trial, Mack had told him that a man named Dion could have been involved in the attack. The detective got a search warrant for Dion's DNA and tested it against the DNA profiles in the 2003 case. But Dion was excluded as a potential contributor.

The jury found Mack guilty of rape, aggravated criminal sodomy, aggravated kidnapping, aggravated robbery, and aggravated burglary, and the district court sentenced him to 406 months in prison. He appeals, raising several claims of error.

I.    *We Find No Reversible Instructional Error*

We first address Mack's argument that his aggravated-kidnapping conviction should be reversed because the district court made an alternative means error in its instructions.

When the State charges a defendant with a crime that can be committed in more than one way, this is called an alternative means crime. See *State v. Rucker*, 309 Kan. 1090, 1094, 441 P.3d 1053 (2019). A district court presents an alternative means crime to a jury when its instructions on a charged offense incorporate multiple means for a single statutory element. *State v. Sasser*, 305 Kan. 1231, 1239, 391 P.3d 698 (2017). The aggravated-kidnapping instruction here told the jury it could convict Mack of this crime if the State proved that he had confined Jane with the intent to hold her to (1) "facilitate the commission of any crime" or (2) "inflict bodily injury or to terrorize [her]." Mack argues that the State failed to prove that Jane was confined with intent to hold her to

4

facilitate the commission of any crime, and because the jury instruction presents an alternative means crime, the court must reverse unless sufficient evidence supports each means. See *State v. Wright*, 290 Kan. 194, Syl. ¶ 2, 224 P.3d 1159 (2010) (requiring substantial evidence supporting each means of criminal element included in instruction).

But while this case was on appeal, the Kansas Supreme Court rejected *Wright*'s "inflexible rule" that requires sufficient evidence of each means of a criminal element included in an instruction. *State v. Reynolds*, 319 Kan. 1, 2, 552 P.3d 1 (2024). It set out a different approach to the alternative means issue, found immaterial any distinction between alternative means and options within a means, and held that an alternative means instructional error can be harmless error. 319 Kan. at 17, 21. We asked the parties to give us supplemental briefs on *Reynolds*' impact on this case, and they did so.

Under the new framework provided by *Reynolds*, appellate courts review alternative means challenges just as we do other instructional challenges. This means that "[i]f a defendant claims a jury instruction contained an alternative means error, the reviewing court must consider whether the instruction was both legally and factually appropriate." 319 Kan. 1, Syl. ¶ 4. If an instructional error occurred but the defendant did not challenge this error before the district court, the defendant is entitled to a new trial only if he shows that the instruction was clearly erroneous. 319 Kan. at 18-19; see K.S.A. 22-3414(3). Mack did not object to this instruction at trial, so we apply this clear error standard. Under this standard, an error is clear when the court is firmly convinced that the jury would have reached a different verdict if the instructional error had not occurred. *State v. Martinez*, 317 Kan. 151, 162, 527 P.3d 531 (2023).

First, Mack argues that this court should not apply the *Reynolds* framework because *Reynolds* is not yet final, was wrongly decided, and conflicts with binding United States Supreme Court precedent—*Griffin v. United States*, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991)—so is a likely candidate for a certiorari petition. Mack

5

argues that rather than apply the clear error test, this court should apply either the constitutional harmless error test or the structural error test, mandating reversal. But we must decline that invitation and apply *Reynolds* because we are duty-bound to follow Kansas Supreme Court precedent even if that precedent conflicts with other binding authority, absent some indication that the court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). And even if *Reynolds* is not yet final so is not binding precedent, this court can still draw guidance from its reasoning. *Reynolds* gives us clear indication that our Supreme Court is departing from its previous position established in *Wright*. We thus follow its guidance. Here, as in *Reynolds*, no constitutional right has been violated. But even if it had,

> "clear error still applies—just as it does for any other unpreserved jury instruction issue under K.S.A. 22-3414(3). See, e.g., *State v. Jarmon*, 308 Kan. 241, 244, 419 P.3d 591 (2018) (applying clear error to an unobjected-to instruction that, had the defendant objected, would be governed by constitutional harmless error)." *Reynolds*, 319 Kan. at 18-19.

Mack next argues that this jury instruction was not legally appropriate because "the State's theory of facilitation was contrary to . . . the legal definition of 'facilitate'" laid out by *State v. Buggs*, 219 Kan. 203, 216, 547 P.2d 720 (1976). The State counters that *Buggs* should be overruled, but we lack the power to do that so decline to analyze that issue. See *State v. Moore*, 319 Kan. 557, 566, 556 P.3d 466 (2024) (declining State's invitation to revisit *Buggs*).

Jury instructions are legally appropriate when they fairly and accurately state the applicable law. 319 Kan. at 566. And the aggravated-kidnapping jury instruction accurately reflected the elements of aggravated kidnapping under K.S.A. 21-3421 (Torrence). See K.S.A. 21-5408(b) (same). It is thus legally appropriate.

Mack essentially argues that the facts did not meet the definition of "facilitate," so we must determine whether the instruction was factually appropriate. A jury instruction is factually appropriate when some evidence—viewed "in the light most favorable to the requesting party"—makes the instruction relevant to the facts of the case. *Reynolds*, 319 Kan. at 17; *Moore*, 319 Kan. at 565. The aggravated-kidnapping instruction told the jury it could convict Mack of this crime only if the State proved that he had confined Jane with the intent to hold her to facilitate the commission of any crime or inflict bodily injury or to terrorize her.

Mack implicitly concedes that some evidence showed that he confined Jane with the intent to inflict bodily injury or terrorize her. But he argues that no evidence shows that he confined Jane with the intent to facilitate the commission of another crime, as *Buggs* defined it. Under *Buggs*:

> "[I]f a taking or confinement is alleged to have been done to facilitate the commission of another crime, to be kidnapping the resulting movement or confinement:
> "(a) Must not be slight, inconsequential and merely incidental to the other crime;
> "(b) Must not be of the kind inherent in the nature of the other crime; and
> "(c) Must have some significance independent of the other crime in that it makes the other crime substantially easier of commission or substantially lessens the risk of detection." 219 Kan. at 216.

Mack may be correct that the evidence cannot establish this element beyond a reasonable doubt under pre-*Reynolds* precedent in *Buggs*. The facts here are much like those in the pre-*Reynolds* case of *State v. Couch*, 317 Kan. 566, 586-87, 533 P.3d 630 (2023), *abrogated by State v. Garcia-Martinez*, 318 Kan. 681, 546 P.3d 750 (2024) (finding rape through force necessarily and inherently requires confinement of victim to particular place where rape occurs so defendant's grabbing victim and dragging her to bedroom had no independent significance apart from rape). But Mack's argument requires substantial evidence supporting each means of a criminal element included in an

7

instruction, as *Wright* required, yet *Reynolds* rejected. Mack fails to show the instruction was factually erroneous under *Reynolds*.

And even if instructing on facilitation was factually erroneous under *Reynolds*, Mack has failed to meet his burden to show clear error. Mack implicitly concedes that some evidence shows that he confined Jane with the intent to inflict bodily injury or to terrorize her. Our review of the evidence in the light most favorable to the State shows that Mack's jury had ample evidence and they understood he did so, given their convictions for rape and aggravated criminal sodomy. See *State v. Brown*, 181 Kan. 375, 389, 312 P.2d 832 (1957) (recognizing rape was unnecessary, violent act not part of kidnapping and thus proved bodily harm). The jury thus unanimously found Mack had harmed Jane. We thus are not firmly convinced that the outcome of Mack's trial would have been different had the instruction omitted the language "facilitat[ing] the commission of any crime." See S*tate v. Duong*, 292 Kan. 824, 839, 257 P.3d 309 (2011).

II.     *The District Court Did Not Abuse Its Discretion by Not Appointing New Trial Counsel*

We next address Mack's two-pronged attack on the district court's decision to deny his request for new trial counsel. He first argues that the district court failed to appropriately inquire into allegations he raised on the morning of trial that his trial counsel had a conflict of interest. Then he asserts that because his trial counsel had an actual conflict, the district court erred by failing to appoint substitute counsel. But before we address these issues, we lay out more background facts.

*Mack had a strained relationship with prior counsel.*

From the time Mack was originally charged in April 2020 to his conviction in May 2022, he was represented by two attorneys: Jason Belveal and KiAnn Caprice. He had a strained relationship with both.

Belveal represented Mack from his preliminary hearing to the first pretrial conference—from June 2020 to August 2021. During this time, Mack made several verbal requests to continue hearings minutes before they were to start, asserting that he wanted a different attorney. Mack cited various reasons for these requests, including his frustration that Belveal was not representing him as diligently as Mack would have liked. Once, Mack requested a continuance because he said he was about to retain his own attorney. The court, finding that this other attorney had not yet entered his appearance, denied the request because continuing the proceedings would have been premature.

In August 2021—less than a month before trial—Mack wrote a letter asking the judge to "remove attorney Jason Belveal as my appointed counsel and replace him with someone who will follow through on obtaining exculpatory evidence and interviewing witnesses." Mack stated that for the last 18 months, he had been "begging" Belveal to work on his case, but Belveal had missed several meetings and had been pushing Mack to take a plea. Mack said that the "breakdown in our client/attorney relationship is beyond repair." And with his "life and freedom on the line," Mack said he was "begging" the court to "please remove Mr. Belveal and appoint [him] a new attorney."

At the evidentiary hearing on Mack's motion, Mack complained that he and Belveal struggled to communicate and that he could no longer trust Belveal. Mack stated that it had been "17, 18 months and . . . there's pretty much been nothing done on my behalf in this case." Mack's main complaint was that Belveal had asked Mack to give him the names and numbers of the people Mack wanted him to contact. Mack complained that

9

"I gave him the names [but] Mr. Belveal is like, well, I need numbers, I need blah, blah, blah. I need—like, I mean, it's not that hard to do." And Mack said that because his entire defense was "pretty much based" on these corroborating witnesses, Belveal's failure to find them himself completely undermined Mack's case.

Belveal responded that, for over a year, he had repeatedly asked Mack for contact information for these witnesses, but Mack had refused to provide that. Mack blamed him for being unable to find them, and Mack would often just hang up the phone after venting his frustration. Belveal told the court that he had done everything he could for Mack's defense without the witnesses' contact information. Ultimately, Belveal said he was asking for new counsel "because that's what [he was] required to do."

After hearing this testimony, the court found "there has been a material breakdown in communication" between Mack and Belveal and allowed Belveal to withdraw as counsel. The court warned Mack, however, that he would not get his pick of appointed counsel and that the court would not automatically allow him to remove counsel again. The court explained, "you're not entitled to the lawyer of your choice, and if you come forward to me with similar complaints in the future, there is no guarantee that I'm going to let somebody leave your case. Because as I told you, matters of strategy go to your lawyer." The court then appointed Caprice as Mack's new counsel and continued Mack's trial.

*Mack requests a continuance of trial at the final pretrial hearing.*

About eight months later, at the final pretrial hearing, Caprice told the court that Mack was requesting a continuance of the trial because he believed that the allegations against him were "perpetrated by . . . a master manipulator"—Sarah. Mack wanted the court to know that Sarah was willing "to come forward and admit . . . that she . . . '[s]et [Mack] up.'" Caprice told the court that Sarah had already been subpoenaed by the State

10

as a witness, but that Caprice would still have her private investigator try to contact Sarah later that day.

Caprice told the court that Mack wanted her to put on the record that he believed that if this case were properly investigated, the State would probably be in a position to dismiss it. Caprice said she planned to call several witnesses to support this defense, including Mack's mother and his child's mother. Caprice said Mack had asked her to request a continuance of the trial because this information had just recently come to light. The State objected to the continuance, arguing that Mack had an "extraordinarily long period of time to prepare his defense for trial." Then Caprice clarified that Mack wanted the continuance because he hoped that the case would be dismissed if the State continued its investigation.

The district court denied the motion to continue, finding that Mack's case had been on file for over two years, the allegations were 18 years old, the trial had already been continued once, and no extraordinary circumstances warranted continuing it again. The court noted, however, that now that Caprice had the contact information for these witnesses, she would have enough time to contact them before trial.

After conferring with Mack, Caprice requested a continuance on an additional basis—that Mack said that these witnesses had just come forward and that Sarah and another possible suspect, Dion, were "on the run." But the district court again denied the motion.

*Mack raises three complaints against Caprice the morning of trial.*

On the morning of trial before jury selection started, Mack raised the complaints that he raises in this appeal. Caprice told the court that Mack had just told her that he was dissatisfied with her representation and that earlier that morning he had reached out to

11

another attorney who he said was willing to enter his appearance that day. Caprice explained that she was "ethically bound to ask the Court for a continuance so [Mack] can have the attorney of his choice," but she said she had explained to Mack that the court "may or may not grant that request."

Caprice then addressed Mack's three complaints about her representation: She had not talked to all the witnesses he wanted her to; she had not subpoenaed anyone; and she declined to put on good character evidence in his defense.

First, as to not talking with all witnesses Mack desired, Caprice told the court that many people that Mack wanted her to talk to were already State's witnesses. As for one person who was not, Caprice explained that she had filed a motion to allow this person to testify about Sarah's prior bad acts and that she had told Mack that the court had to rule on that motion before this witness, who lived in Texas, could testify over Zoom. Caprice also explained that her private investigator had done substantial work on this case, and she had "detailed records of who we have talked to and not."

Second, as for not subpoenaing witnesses, Caprice said that her general strategy "has been for a long time," and "especially in a case such as this," that if a person did not want to testify voluntarily, she did not believe it would help to "throw them in jail" because their testimony would probably end up being unfavorable. Caprice again highlighted that most of the witnesses that Mack referenced were already State witnesses.

And third, as for not putting on evidence of Mack's good character, Caprice said that to do so would be bad strategy:

> "I will say for the record that I have informed my client that it would be . . . a bad choice and strategically, I'm not going to do this, to call character evidence for him via

12

employers over the last 20 years . . . because what that does then, is it opens the door to his other criminal activity.

"He has a methamphetamine case in this jurisdiction at this point. Obviously, he had a conviction which required the submission of a DNA, which brought us all here today, and that's just not something strategically that I'm going to do is bring in character evidence over the last 20 years because that would not be, in my opinion, in his best interest."

The court then allowed Caprice and Mack to speak together privately. After they did so, Caprice told the court that Mack had just told her that over the weekend he had secured contact information for all the people he wanted her to talk to, but Mack had not yet given her any such contact information. She also repeated Mack's new assertion that he had secretly recorded her conversation with the prosecutor about another case.

The district court then cleared the courtroom to further investigate Mack's complaints about Caprice. After hearing from Mack and Caprice, the court invited the State back into the courtroom. The State opposed Mack's motion for continuance to get new counsel, arguing his request was not made in good faith because Mack's actions showed he did not want his trial to happen.

*The district court finds no justifiable dissatisfaction.*

The district court then denied Mack's request to appoint new counsel, finding Mack had failed to show justifiable dissatisfaction with Caprice. The court found that all of Mack's complaints about Caprice concerned matters of trial strategy and he had "no reason" to believe that the attorney-client relationship had deteriorated so much that new counsel was warranted. The court found that Caprice had done her duty, had made strategic decisions, and could give effective aid to Mack in presenting a fair defense.

13

We now reach the merits of whether the district court abused its discretion by denying his request to appoint new counsel on the morning of trial. Mack first argues that the district court failed to sufficiently inquire into his assertion that Caprice had a conflict of interest. He then argues that the court should have recognized several actual conflicts which required the court to appoint new counsel.

A. *We apply the justifiable dissatisfaction standard*.

Under the Sixth Amendment to the United States Constitution, Mack had a right to effective assistance of counsel during all critical stages of the criminal proceeding. *State v. Pfannenstiel*, 302 Kan. 747, 758-59, 357 P.3d 877 (2015). Still, defendants are not guaranteed the right to choose which attorney will be appointed to represent them. As a practical matter, this means that defendants do not have the absolute right to new counsel. 302 Kan. at 759. In addition, the United States Supreme Court "'has recognized that either a defendant or defense counsel might raise a potential conflict as the basis for seeking new counsel "for purposes of delay or obstruction of the orderly conduct" of the proceedings.'" *State v. Valdez*, 316 Kan. 1, 27, 512 P.3d 1125 (2022) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 486, 98 S. Ct. 1173, 55 L. Ed. 2d 426 [1978]). And our own Supreme Court in *State v. Trass*, 319 Kan. 525, 537, 556 P.3d 476 (2024), recently reminded us that "[w]hile a criminal defendant 'must be provided a fair opportunity to obtain counsel of his or her choice, this right cannot be manipulated to impede the efficient administration of justice.' *State v. Anthony*, 257 Kan. 1003, 1019-20, 898 P.2d 1109 (1995) (citing *State v. Bentley*, 218 Kan. 694, 695, 545 P.2d 183 [1976])."

So a defendant is entitled to new counsel only if he or she first shows justifiable dissatisfaction with current counsel. *Pfannenstiel*, 302 Kan. at 759. A defendant establishes justifiable dissatisfaction by showing "a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication." *State v. Brown*, 305 Kan. 413, 424, 382 P.3d 852 (2016). Mack alleges only conflicts of interest here. The Sixth

14

Amendment right to counsel contains a correlative right to representation that is unimpaired by conflicts of interest or divided loyalties. *Pfannenstiel*, 302 Kan. at 758. "Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case." 302 Kan. at 758.

This court reviews "both the adequacy of a district court's inquiry into a potential conflict and its ultimate decision on a motion for new counsel for abuse of discretion." *State v. Z.M.*, 319 Kan. 297, 299, 555 P.3d 190 (2024). And the party challenging the district court's decision—here, Mack—must show that the court's action was based on an error of law, an error of fact, or was unreasonable. *Valdez*, 316 Kan. at 25. When a district court becomes aware of a potential conflict of interest between a defendant and his or her attorney but fails to conduct an inquiry, this failure constitutes an error of law and, thus, an abuse of discretion. *Pfannenstiel*, 302 Kan. at 761. But no such claim is raised here, as both parties agree that the district court conducted an inquiry. Still, a district court errs if a defendant makes an articulated statement of justifiable dissatisfaction, and the court fails to conduct an "appropriate inquiry" into the defendant's complaint. 302 Kan. at 761. The court also errs if, after conducting an appropriate inquiry, its refusal to appoint substitute counsel was unreasonable. 302 Kan. at 762.

B. *The district court appropriately inquired into Mack's complaint.*

We first address Mack's argument that the district court failed to appropriately inquire into his complaint that Caprice had a conflict of interest.

To satisfy its duty to investigate a defendant's complaint, a district court must fully investigate (1) the basis for the defendant's dissatisfaction with counsel and (2) the facts necessary for determining whether that dissatisfaction warrants appointing new counsel. *Valdez*, 316 Kan. at 25. This investigation, however, is not demanding and should not be

especially time consuming or burdensome. *In re B.H.*, 64 Kan. App. 2d 480, 494, 550 P.3d 1274 (2024). For example, the district court need not make "'a detailed examination of every nuance'" of a defendant's claim. *State v. Toothman*, 310 Kan. 542, 554, 448 P.3d 1039 (2019). Rather, the district court may ask a "'single, open-ended question'" if it gives the defendant "'the opportunity to explain'" the alleged conflict of interest. *Valdez*, 316 Kan. at 25. "'An inquiry assures any delay is for good cause, thereby avoiding automatically delaying proceedings by discharging the current counsel and appointing new counsel for all motions seeking substitute counsel, regardless of the motion's merits.'" 316 Kan. at 27 (quoting *Pfannenstiel*, 302 Kan. at 764).

### 1. *The district court asks Mack about his complaints*.

After the district court cleared the courtroom to further investigate Mack's complaints about Caprice, it told Mack this was his opportunity to explain his conflict with Caprice, that the court would not interrupt him, and that it wanted Mack's explanation for why it should remove Caprice as his lawyer.

Mack told the court that he was unhappy because of "the way that [Caprice was] handling me, the way she's handling the information I'm giving her, and . . . a lot of this stuff . . . is being done last minute." Mack said that he had given Caprice the names of witnesses months before but that she was only now trying to contact them. He also complained that many of those potential witnesses were family members, and that Caprice had spoken to only one or two of them.

Mack emphasized his frustration with how Caprice was handling the testimony of the witness who was willing to testify to Sarah's prior bad acts. Mack said that if Caprice had spoken with that witness earlier, "we might not even be going to court." And although Mack said he understood that "some evidence can't be admitted in at a certain time," he said Caprice was "moving and doing what she wants to do how she wants to do

16

it instead of what I'm asking her to do." Mack said he had asked Caprice "on numerous occasions" whether she was "working for me or are you working with them."

Mack said that he had been forced to hang up on Caprice and the private investigator during several phone calls because Caprice had been very rude to him. He also said that Caprice had been unprofessional—she had treated his concerns too "nonchalantly."

Mack complained that Caprice refused to put on good character evidence in his defense—that he had been an upstanding member of the community for 20 years—because Caprice did not want the jury to learn that he had a drug problem in the past. Mack, however, said: "I don't have a problem with [that] because I am who I am. I own what I've done, and where I came from made me who I am today. So . . . that's what I want to do. I have no problem doing that."

Essentially, Mack told the court that he was having the same issues with Caprice that he had had with Belveal—"I shouldn't have to feel like I'm having to work when that's her job." He complained that he had been giving Caprice "all these names," and "[s]he's just now entering them today." He said he felt like the way Caprice was treating him made him feel like he was "on trial with her as well."

After he had finished, the court asked, "Anything else, Mr. Mack?" to which he responded, "That's it, Your Honor." The court clarified, "There's nothing else you want to tell me regarding your conflict with Ms. Caprice; is that right?" And Mack replied, "Yes, Your Honor."

17

## 2. *Caprice responds to Mack's complaints.*

The court then allowed Caprice to respond. She first addressed how she had handled Mack. She explained that she tells all her clients the same thing: That she is "not their friend . . . [,] not their mother, their girlfriend, their pastor, their counselor," and that she is not there "to make them feel good," but that she is there "to do a job for them to the best of [her] ability." Caprice said she always gives her clients "homework" because she believed that "as Mr. Mack said, this is his life and he must participate in his defense if he wants the very best result."

Caprice explained that sometimes her "serious" personality can be "interpreted as being rude," especially by male clients, who may "expect something different from a female attorney." But, Caprice said, these clients usually "come around" and realize that she is there "to get them acquitted. Get the very best result that I can for them."

And as for Mack's complaint that she had not "worked with him," Caprice said Mack had missed five appointments for "various reasons" or "no reason at all." Mack had also complained about their first meeting being at an apartment complex where he worked, but Caprice explained that meeting was "actually supposed to be at the courthouse," but Mack had not shown up, so she had called him and agreed to meet him at the apartment.

Caprice then addressed Mack's complaint that she had not followed through on the information he had given her. She said that she had extensively investigated all the information he had given her and emphasized that Mack had gathered information "just this weekend" for the people he wanted interviewed. As for those people, Caprice said that she had talked to the detective and that after his investigation the State added several of them to its witness list. And as for Dion, Caprice explained that after Mack gave the detective Dion's name, the detective had gotten a search warrant for Dion's DNA and

18

"rushed" the report through the KBI. But DNA tests excluded Dion as a potential contributor in the 2003 case.

As for the good character evidence that Mack desired, Caprice explained that Mack's assertion that he had not been in trouble for 20 years was a "misstatement of fact." Mack had other recent convictions, one of which led to his DNA being collected and eventually to his arrest in this case. Caprice emphasized that whether to introduce evidence of a defendant's good character was a strategic decision that she gets to make as counsel and introducing this evidence would not be helpful in Mack's case. Plus, Caprice believed if she admitted character evidence it would open the door for the State to admit evidence of Mack's recent convictions, and Mack would then argue on appeal that she was ineffective in doing so.

Caprice said she had told Mack that he was welcome to retain other counsel but that it was unlikely that the court would grant a continuance to allow him to "maybe" retain new counsel. So, she told him, he "needs to be prepared . . . [to] cooperate with [her] during trial."

Finally, Caprice addressed Mack's complaint that "he has a conflict with [her]":

> "Finally, I guess I would want to address his claim that he has a conflict with me. I do not have one with Mr. Mack. It is not uncommon for clients facing such a serious case on the eve or the morning of trial to—the analogy I use is, I like to watch the horse races and you see the horses all jittery and nervous as they are getting up to get into the gate for the race. This is not uncommon.
> "I do not take personal offense to anything he's saying. I am confident in the work that I've done. I have the backup of a private investigator in this case, who's done a lot of work. I do not take personal anything Mr. Mack has said. I'm prepared to try this case.

19

"I'm not asking to withdraw. The Court made it clear when I was appointed that this case is going to trial. The Court did make it clear that when we picked a trial date, that it was far enough out that the Court was not going to allow me to come forward, absent some unforeseen circumstance, and claim that I was unprepared. I am prepared."

### 3. *The district court made an appropriate inquiry*.

The record shows that the district court appropriately inquired into Mack's claim of a conflict of interest. It allowed Mack to thoroughly explain the various complaints he had with Caprice's representation, including her alleged failure to talk to all the witnesses he wanted her to, her failure to subpoena anyone, and her decision not to put on evidence of Mack's good character. After Mack finished, the district court ensured that there was nothing else Mack wanted to add before it allowed Caprice to respond. By listening to Mack's and Caprice's statements, the district court learned the basis for Mack's dissatisfaction with Caprice as well as the facts necessary to determine whether that dissatisfaction was justifiable.

Still, Mack argues that the district court's investigation was inadequate because it did not ensure that Caprice had "interview[ed] each potential witness" that he wanted her to. So the court could not tell whether Caprice had made an informed decision based on a thorough investigation of the facts and applicable law. See *Wilson v. State*, 51 Kan. App. 2d 1, 14, 340 P.3d 1213 (2014). But the district court had no duty to inquire into every nuance of Mack's claim. "A court is not required to engage in a detailed examination of every nuance of a defendant's claim of inadequacy of defense and conflict of interest." *State v. Staten*, 304 Kan. 957, 972, 377 P.3d 427 (2016). This was not an inquiry into a claim of ineffective assistance of counsel, as was *Wilson*, which had held a two-day evidentiary hearing on that matter. Mack raised no claim of ineffective assistance of counsel, and it would likely violate Caprice's due process rights for this court to determine sua sponte that Caprice's representation was constitutionally

20

ineffective before she has had an evidentiary hearing on that issue. And the nature of the ineffective assistance of counsel inquiry is significantly different from the narrower inquiry required of the district court here. The district court's inquiry satisfied its duty to investigate by asking Mack about his complaints, listening to his responses, and ensuring that Mack had articulated all relevant facts.

The district court gave each party ample time to complain and respond, and it gathered all the facts necessary to determine whether Mack's complaints satisfied the justifiable dissatisfaction standard for appointment of new counsel. It fully investigated the basis for the defendant's dissatisfaction with counsel and the facts necessary for determining whether that dissatisfaction warranted appointing new counsel. Thus, we find that the district court conducted an appropriate inquiry into Mack's complaints.

C. *The district court correctly found that Caprice did not have a conflict of interest that required the appointment of new counsel.*

Mack next argues that several statements Caprice made during the justifiable dissatisfaction inquiry created or revealed a conflict of interest, so the district court abused its discretion by not appointing substitute counsel. A "conflict of interest" is defined as a "real or seeming incompatibility between one's private interests and one's public or fiduciary duties." Black's Law Dictionary 374 (11th ed. 2019). Because a conflict of interest "can take many forms," determining whether a conflict exists is a fact-specific inquiry. *Pfannenstiel*, 302 Kan. at 758. Generally, a conflict of interest arises when "an attorney is placed in a situation conducive to divided loyalties" that leads to her effectiveness being "'substantially diluted.'" 302 Kan. at 758.

We review a district court's refusal to appoint new counsel under an abuse of discretion standard. *State v. Breitenbach*, 313 Kan. 73, 90, 483 P.3d 448 (2021). Thus, an appellate court will affirm the district court's decision if "any reasonable individual would

21

take the view [it] adopted." 313 Kan. at 90. Although Mack and the dissent view the district court's refusal to appoint new counsel as an error of law, they err in so doing, as they point to no statute or decisional law the district court violated. To the contrary, the district court applied the correct legal standard—justifiable dissatisfaction—and similarly applied the correct conflict of interest analysis. Mack's real beef is thus with the way the district court exercised its discretion in applying the law. We thus use the "no reasonable person" prong of the abuse of discretion standard, as our Supreme Court has done. *Pfannenstiel*, 302 Kan. at 759-60 (finding the court errs if, after conducting appropriate inquiry, its refusal to appoint substitute counsel was unreasonable); see *Z.M.*, 319 Kan. at 311 (finding court's decision that Z.M.'s claims did not require appointment of substitute counsel was reasonable); *State v. Hegwood*, 256 Kan. 901, 903, 888 P.2d 856 (1995) (applying to court's decision whether to appoint substitute counsel standard that "[j]udicial discretion is abused when the action taken is arbitrary, fanciful, or unreasonable, or in other words, when no reasonable person would take the position adopted by the trial court").

Thus, "[i]f the district court has a reasonable basis to conclude that counsel could provide '"effective aid in the fair presentation of a defense,"' then it cannot be found to be an abuse of discretion." *Staten*, 304 Kan. at 970; see also *State v. Henderson*, 205 Kan. 231, 237, 468 P.2d 136 (1970).

The primary purpose of the justifiable dissatisfaction inquiry is "'the adequacy of counsel in the adversarial process, not the accused's relationship with his attorney.'" *Staten*, 304 Kan. at 972. In short, a district court may refuse to appoint new counsel if it has "'a reasonable basis for believing [that] the attorney-client relation has not deteriorated to a point where appointed counsel can no longer give effective aid in the fair presentation of a defense.'" *State v. Turner*, 318 Kan. 162, 171, 542 P.3d 304 (2024). As a practical matter, this means that disagreements between a defendant and counsel— even if the friction between the two is readily apparent—will not rise to the level of

22

justifiable dissatisfaction if the quality of the attorney's representation is not substantially affected. *Brown*, 305 Kan. at 425; *State v. Waterman*, 63 Kan. App. 2d 799, 830, 540 P.3d 378 (2023), *rev. denied* 318 Kan. 1089 (2024); see also *State v. Ferguson*, 254 Kan. 62, 71, 864 P.2d 693 (1993) (lack of cooperation and communication between defendant and counsel does not itself constitute violation of Sixth Amendment right to counsel).

Mack generally asserts that Caprice volunteered information to the court before Mack voiced his complaints to the court. But this fails to show a conflict of interest. Mack had complained to Caprice and had asked for new counsel, so she disclosed that same information while arguing for a continuance so he could get new counsel. And "[i]t is hard to imagine how his attorney could have effectively argued for a continuance without disclosing the reasons the defendant thought a continuance was necessary." See *State v. Marshall*, No. 119,710, 2019 WL 5849911, at *5 (Kan. App. 2019) (unpublished opinion).

Mack also asserts that the district court failed to recognize four actual conflicts of interest, thus abusing its discretion: (1) Caprice breached her duty of confidentiality by accusing Mack of committing a crime and by inviting the State to search and seize his phone for evidence of that crime; (2) she advocated against Mack's request for new counsel; (3) she refused to file subpoenas on behalf of her client; and (4) she refused to put on evidence of Mack's good character because doing so would give rise to a future claim of ineffective assistance of counsel. We address these in turn, recognizing that an "'actual conflict of interest'" is a conflict that "affected counsel's performance—as opposed to a mere theoretical division of loyalties." *Mickens v. Taylor*, 535 U.S. 162, 171, 122 S. Ct. 1237, 152 L. Ed. 2d 291 (2002); see *Cuyler v. Sullivan*, 446 U.S. 335, 349-50, 100 S. Ct. 1708, 64 L. Ed. 2d 333 (1980) ("[A] defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief."); *State v. Sharkey*, 299 Kan. 87, 101, 322

23

P.3d 325 (2014) (presuming prejudice when defendant was constructively denied his right to counsel because of conflict).

> 1. *Caprice did not create a conflict of interest by voicing her misunderstanding about the secret recording.*

First, Mack contends that Caprice created a conflict of interest by telling the court that Mack had told her that he had secretly recorded a conversation Caprice had in the courtroom with the prosecutor about another case. Mack argues that because Caprice is an experienced criminal defense attorney, she should have known that such statements accused Mack of having criminally breached her privacy. This, he argues, when combined with her request that law enforcement seize and search Mack's phone for evidence to support her allegation, amounts to a breach of her duty of confidentiality to Mack.

Before the district court cleared the courtroom, Caprice and Mack were allowed to speak together privately. After they did so, Caprice told the court that Mack had just told her that over the weekend he had secured contact information for all the people he wanted her to talk to, but Mack had not yet given her any such contact information. She then addressed a secret recording that Mack had just brought to her attention:

> "[T]he . . . second to the last time we were in the courtroom, I did ask him to exit the courtroom so I could speak with the prosecutor about another case. [Mack] indicates that he secretly recorded that conversation by standing outside of the courtroom. He is refusing—he has it on his phone. He is refusing to let me listen to that to see if there's some kind of conflict or something we need to address.
> "I'm asking the deputy to take custody of that phone. If this is an issue that he wants brought up, let's bring it up. I'm asking the deputy to take the phone to find that recording, and let's hear it if there's a complaint."

The court asked Mack if he had in fact "made a secret recording," and Mack said "Yes, sir." After further conversation, however, Mack clarified that although he had made records of how Caprice had mistreated him, he had not secretly recorded her conversation with anyone else:

> "What I mean by recordings I have on my phone, I mean I have records of me speaking with [the private investigator], me telling [Caprice] how she mishandled me and me saying what happened in the courtroom, of her pushing me out like a dog. There is no actual recording of me standing by the door with the record button saying that. No, there's not. What I mean by recording and record, is her mishandling me."

Having clarified that misunderstanding, the court then asked Mack to explain his request for a continuance. Mack told the court that he wanted to hire another lawyer because of the way Caprice was handling him and handling the information he was giving her.

Mack overstates the facts by asserting that Caprice accused him of criminal breach of privacy, then asking law enforcement to open a criminal investigation into that allegation by inviting them to seize and search Mack's phone. Caprice did not accuse Mack of having committed the crime of breach of privacy as established in K.S.A. 21-6101(a)(3) or (a)(4), as he alleges, or any other crime. True, she told the court the fact that Mack said he had secretly recorded her conversation with the prosecutor. And when the court asked Mack about it, he confirmed to the court that he had made a secret recording and had told Caprice so. But in repeating the facts to the court, Caprice did not label Mack's acts as a crime or speak to his intent or otherwise suggest that his acts were criminal. Her statement related to the accused's relationship with his attorney and, viewed in context, is most reasonably construed to mean that she wanted the court to further investigate Mack's assertion of a potential conflict.

Nothing about Caprice's statement conveyed her belief that Mack's acts met the elements necessary to establish a criminal breach of privacy under K.S.A. 21-6101(a)(3).

That statute requires one to enter a private place with the intent to listen surreptitiously to private conversations. And as an experienced criminal defense attorney, Caprice would have known that a "private place" does not include a place to which the public has lawful access, such as a courtroom. See PIK Crim. 4th 61.030 (2016 Supp.). Nor does K.S.A. 21-6101(a)(4) apply. It requires one to "install[] or us[e] outside or inside a private place any device for hearing, recording, amplifying or broadcasting sounds originating in such place, which sounds would not ordinarily be audible or comprehensible without the use of such device." K.S.A. 21-6101(a)(4). Yet no facts show, and no one alleges, that Mack's phone made "audible or comprehensible" a conversation that otherwise would not have been so.

Nor did Caprice ask a law enforcement officer to seize Mack's phone or open a criminal investigation. Rather, before the court clarified that Mack had not surreptitiously recorded her conversation with the prosecutor, Caprice conditionally asked the deputy—an arm of the district court—to take Mack's phone. And that request was thrice conditional—to see if there was a conflict that needed to be addressed, or if this was an issue that Mack wanted brought up, or if there was a complaint that Mack wanted to be addressed:

> "He is refusing to let me listen to that to see if there's some kind of conflict or something we need to address.
> "I'm asking the deputy to take custody of that phone. If this is an issue that he wants brought up, let's bring it up. I'm asking the deputy to take the phone to find that recording, and let's hear it if there's a complaint."

To view this as Caprice's accusing Mack of a crime and pursuing a criminal investigation puts an unreasonable spin on what happened. The record shows that Caprice made this request not to open a new criminal investigation but to investigate Mack's assertion that he wanted new counsel. Caprice's goal, as shown by the context of the dialogue, was to have the court investigate any potential conflict further—if Mack relied

26

on some evidence on his phone that showed a conflict. Of course, no one seized Mack's phone and no one pursued a criminal investigation. No one was asked to do so without Mack's consent.

Rather, after the court properly investigated the matter, Mack clarified that he had only made "records" of his own interactions with Caprice that he thought were rude, and the court concluded that no secret recording existed. No one challenges that conclusion. No criminal or tortious breach of privacy occurred, as under Kansas law and federal law, it is generally not illegal to record a conversation to which one is a party. See *State v. Roudybush*, 235 Kan. 834, 843-44, 686 P.2d 100 (1984); see also *Hoffa v. United States*, 385 U.S. 293, 302, 87 S. Ct. 408, 17 L. Ed. 2d 374 (1966) (Fourth Amendment affords no protection to "a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it."). Although we may not condone Caprice's statements, neither do we find that they showed the district court any conflict of interest such that Caprice could no longer effectively aid in the fair presentation of Mack's defense. Mack had misrepresented the facts to Caprice, and the court clarified them.

Still, Mack asserts that Caprice violated her duty of confidentiality under Rule 1.6(a) of the Kansas Rules of Professional Conduct (2024 Kan. S. Ct. R. at 333) by improperly disclosing his confidential communications in open court—and by breaching her duty of confidentiality she breached her duty of loyalty.

Yet Mack does not identify any confidential statement he made to Caprice which she disclosed to the district court. And Caprice's statements about Mack's surreptitious recording were borne of a reasonable misunderstanding based on what Mack had admittedly told her.

And as the State points out, Mack does not show that Caprice's statements trigger KRPC 1.6(a). That rule states, "[a] lawyer shall not reveal information relating to

27

representation of a client unless the client consents after consultation, except for disclosures that are impliedly authorized in order to carry out the representation, and except as stated in paragraph (b)." KRPC 1.6(a). Mack fails to show that the information Caprice disclosed about the alleged recording related to information about her representation of him. Mack does not specify any confidential information that she allegedly disclosed to the court.

The circumstances suggest that Mack told Caprice about his secret recording not so that she would preserve the confidence of that statement, but so that she could add it to his list of grievances against her. It thus appears that Mack had at least implicitly consented to Caprice's telling the court about the alleged secret recording, since Mack told her about it while she was explaining the various complaints that he had asked her to bring to the court's attention. Those complaints related to Mack's dissatisfaction with her refusal to follow his marching orders about how trial was to progress. Mack fails to establish that Caprice breached her duty of confidentiality by repeating to the court his inaccurate statements about a recording.

But even if the information Caprice disclosed triggered the general confidentiality rule, Caprice shows that an exception to the rule applies. KRPC 1.6(b)(3) permits a lawyer to reveal information relating to representation of a client "to the extent the lawyer reasonably believes necessary: . . . (3) to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client . . . or to respond to allegations in any proceeding concerning the lawyer's representation of the client."

Mack argues that this exception does not apply because Caprice was not responding to his allegations. But viewing the facts in context, we disagree. Caprice had been explaining Mack's complaints about her representation in support of his last-minute motion for a continuance. Then, after speaking privately with Mack, she returned and immediately told the court that Mack said he had made a secret recording of her. She then

28

asked the court to investigate further to see if there was a conflict that needed to be addressed or if this was an issue that Mack wanted brought up and if there was a complaint that Mack wanted to be addressed. So when Caprice told the court about the secret recording, she was responding to allegations that Mack had asked her to bring to the court's attention. Caprice's statements were made in response to Mack's allegations of a conflict of interest and were made to help the court determine whether a potential conflict of interest existed. The court's inquiry into whether Mack had justifiable dissatisfaction with Caprice was a proceeding concerning her representation of Mack. Thus, Mack fails to show that Caprice violated KRPC 1.6 by repeating his statements about the non-existent recording.

At any rate, even if Mack's counsel did violate KRPC 1.6, this does not necessarily mean that the district court had to appoint substitute counsel. This is because

> "the rules of professional conduct do 'not constitute ineffective and inadequate counsel as a matter of law. [They are] simply one factor to be considered as a part of the totality of the circumstances in making a judicial determination as to whether an accused has been provided representation by effective counsel.'" *State v. Coleman*, 318 Kan. 296, 319, 543 P.3d 61 (2024).

See *Nix v. Whiteside*, 475 U.S. 157, 165, 106 S. Ct. 988, 89 L. Ed. 2d 123 (1986) ("[B]reach of an ethical standard does not necessarily make out a denial of the Sixth Amendment guarantee of assistance of counsel."). Because the KRPC often sets "a higher standard" than those rights protected by the Sixth Amendment, the violation of an ethical rule does not necessarily mean that counsel's representation was constitutionally deficient. See *Coleman*, 318 Kan. at 319; *State v. Stovall*, 298 Kan. 362, 372, 312 P.3d 1271 (2013). So even if Caprice violated KRPC 1.6, the district court still had to determine whether it believed this matter substantially affected the quality of Caprice's representation. See *Coleman*, 318 Kan. at 319. The court did so, finding, in the exercise of its discretion, that it did not.

29

Nor does Mack explain how Caprice's statements about the secret recording affected her ability to represent him. The district court investigated this potential issue and found it came to nothing. It concluded that there was "no reason" to believe that the "attorney/client relationship has deteriorated to the point where new counsel [was] warranted" and that Caprice could "give effective aid to [Mack] in presenting a fair defense." Thus, it was reasonable for the court to conclude that Caprice's statements about Mack's alleged recording did not create a conflict of interest that required the appointment of substitute counsel. We find no abuse of discretion.

2. *Caprice did not create a conflict by responding to Mack's complaints against her.*

Second, Mack argues that Caprice created a conflict of interest by improperly advocating against his position when she responded to his complaints about her representation. Mack argues that Caprice advocated against his position by expressing her opinion about the merits of his claim and implying that his motion for a continuance was not made in good faith. He points to these two statements: (1) her statement "I do not have [a conflict] with Mr. Mack"; and (2) her comparison of Mack's request for a continuance to the behavior of a racehorse, who is "all jittery and nervous as they are getting up to get into the gate for the race."

Attorneys may not advocate against their client's position during a conflict-of-interest inquiry; but they do have some leeway when explaining the context of their client's complaints to the district court. See *Z.M.*, 319 Kan. at 308-09. Put another way, if an attorney's statements do not "compromise any confidential information, concede [the defendant's] guilt, or establish that [the attorney] had any interest that materially limited [their] representation of [the defendant]," an attorney may speak with the court relatively candidly so that the court is able to collect the facts necessary to determine whether the

30

defendant's dissatisfaction is justified. *State v. McGee*, 280 Kan. 890, 896, 126 P.3d 1110 (2006); see *Z.M.*, 319 Kan. at 309.

> a. *Caprice's statement that she did not believe she had a conflict of interest did not create a conflict of interest.*

Mack alleges that Caprice's statement—"I do not have [a conflict] with Mr. Mack"—created a conflict of interest that required the appointment of substitute counsel, citing *State v. Prado*, 299 Kan. 1251, 329 P.3d 473 (2014).

When an attorney's statements simply seek to clarify the facts, they may contradict the defendant's allegations. See *State v. Jarmon*, 308 Kan. 241, 252, 419 P.3d 591 (2018) ("Although some of these statements contradicted Jarmon's allegations, they constituted factual recitations rather than advocacy against Jarmon's motion."). Similarly, attorneys may make "evaluative statement[s] regarding [trial] strategy," like whether they believe a potential witness' testimony "would not be helpful" or might undermine the defendant's defense. *Pfannenstiel*, 302 Kan. at 767; see *State v. Foster*, 290 Kan. 696, 709, 233 P.3d 265 (2010). And attorneys may make statements about their subjective belief as to whether they had effectively represented their client or whether they believed they had a conflict of interest. *Z.M.*, 319 Kan. at 308-09; *McGee*, 280 Kan. at 896.

In *Prado*, the Kansas Supreme Court found that an attorney had improperly advocated against his client's position during a conflict-of-interest inquiry when the attorney told the district court: "'I didn't file a motion to withdraw based on conflict because I didn't see a conflict.'" 299 Kan. at 1255, 1260. True, Caprice's statement is similar to that made by the attorney in *Prado*.

Yet in several cases post-*Prado*, the Kansas Supreme Court has softened its approach to how courts should view attorneys' statements made during the conflict-of-

interest inquiry. Most recently, in *Z.M.*, it found no conflict when the attorney stated: "'I can't see [a conflict]'" and "'So, Judge . . . if the Court's question to me is . . . whether there's a basis under the law to justify my removal as counsel[,] my answer is no.'" 319 Kan. at 297. In reaching that conclusion, the majority in *Z.M.* relied on Justice Biles' dissent in *Prado*, in which he concluded that "'Prado's counsel's statement that he "'didn't see a conflict'" [had] merely expressed an independent professional judgment about whether he had perceived prior to the hearing any duty to withdraw based on his relationship with his client.'" 319 Kan. at 309 (quoting *Pfannenstiel*, 302 Kan. at 770 [Biles, J., dissenting in part]).

In *Pfannenstiel*, defense counsel made two comments that approached the line of advocating against the defendant's position: first, by making an evaluative statement regarding her strategy, indicating she felt Pfannenstiel's witnesses would not be helpful and might undermine his testimony; and second, by saying the defendant had misunderstood some things she told him. 302 Kan. at 767. The *Pfannenstiel* court found both comments acceptable, reasoning the former concerned a strategic decision, generally an appropriate area of inquiry; and the latter supported the defendant's allegation that communications had broken down and was followed by counsel's request to grant defendant's motion. 302 Kan. at 767.

Similarly, in *Valdez*, defense counsel gave mostly factual responses during the colloquy but offered some self-evaluation. She twice told the district court she was "'prepared'" at trial and did not believe she could have changed the outcome. She also told the court Valdez had "'never been happy,'" and that his letters to her were not "'constructive.'" 316 Kan. at 28. But the court found "these insignificant remarks did not require new counsel." 316 Kan. at 28. In reaching that decision, the Kansas Supreme Court relied on *Pfannenstiel*, and never cited *Prado*.

32

We do the same in finding that Caprice's statement as to whether she had a conflict with Mack simply expressed her independent professional judgment about how she perceived her relationship with him—she saw no duty to withdraw based on her relationship with Mack. This statement did not reveal any confidential information, concede Mack's guilt, or show that Caprice had any interest that materially limited her representation of Mack. That Caprice and Mack had different opinions on whether Caprice had a conflict of interest did not change Caprice's ability to provide fair representation for Mack's defense. We thus find this statement did not itself create a conflict of interest. Cf. *Z.M.*, 319 Kan. at 309 ("While Z.M. thought the communication was insufficient and . . . Chappas thought the communication was sufficient, their *opinions* on the sufficiency of their communications did not create a conflict of interest because their opinions did not change the facts that pre-existed the hearing, or the strength of Chappas' loyalty to Z.M., or the ability of Chappas to advocate for Z.M."). No abuse of discretion has been shown.

### b. *Caprice's comparison of Mack to a jittery racehorse did not create a conflict of interest.*

We next address Caprice's statement that compared Mack's request for a continuance to the "not uncommon" behavior of a racehorse who is "all jittery and nervous as they are getting up to get into the gate for the race." Mack argues that Caprice suggested that Mack sought new counsel simply because he wanted to continue the trial, not because he was dissatisfied with her representation.

But Caprice's statement more plainly explained Mack's behavior as common because clients become increasingly nervous when trial begins and its reality sinks in. We do not agree that by making this racehorse comparison Caprice impermissibly advocated against Mack's position by opining that Mack's request for a continuance lacked merit. True, the inquiry into whether a defendant has demonstrated justifiable dissatisfaction

33

with his or her attorney requires both the court and defense counsel to walk a delicate line. *Pfannenstiel*, 302 Kan. at 766. But even if Caprice's comment approaches the line of advocating against Mack's position, the district court did not abuse its discretion by finding that she had not crossed it. See 302 Kan. at 767 (finding no impermissible advocacy in attorney's evaluative statement regarding her strategy, stating she felt Pfannenstiel's witnesses would not be helpful and might undermine his testimony).

### 3. *Caprice's statements about not subpoenaing witnesses did not reveal a conflict of interest.*

Third, Mack argues that Caprice revealed a conflict of interest when she told the court that she would not subpoena witnesses. Mack acknowledges that matters of trial strategy—such as which witnesses to call or what evidence to present—are "virtually unchallengeable" because these decisions are left to the professional judgment of the attorney.

We agree. The Kansas Supreme Court has long held that "strategic and tactical decisions," including the decision of which witnesses to call, are within the "exclusive province of [defense counsel] after consultation with [their] client." *Winter v. State*, 210 Kan. 597, Syl. ¶ 2, 502 P.2d 733 (1972); see *Foster*, 290 Kan. at 709 (the decision on which witnesses to call is matter of trial strategy left to professional judgment of attorney). Mack's complaints involved matters of trial strategy that Mack was not permitted to dictate to counsel. See *Trass*, 319 Kan. at 537 ("'[T]here is no constitutional right to be represented by a lawyer who agrees with the defendant's trial strategy.'") (citing *United States v. Leggett*, 162 F.3d 237, 247 [3d Cir. 1998]). As the Kansas Supreme Court has recently underscored:

> "[D]isagreements about trial strategy do not 'show a complete breakdown in communication.' *Brown*, 305 Kan. at 426; see also *State v. Burnett*, 300 Kan. 419, 450-51, 329 P.3d 1169 (2014) (defendant had not shown justifiable dissatisfaction or that

34

complaints would be remedied by new counsel when complaints stemmed from defense counsel's refusal to investigate matters or call witnesses defendant deemed important)." *State v. Turner*, 318 Kan. 162, 172, 542 P.3d 304 (2024).

Still, Mack maintains that because Caprice admitted that she did not talk to every potential defense witness before trial, she could not have made adequately informed strategic decisions. Mack thus asserts that Caprice cannot simply invoke "trial strategy" to insulate her deficient performance.

We find Mack's argument unpersuasive. An attorney need not investigate every potential lead but may reasonably decide that particular investigations are unnecessary. *Breitenbach*, 313 Kan. at 90-91. Caprice conferred with her client about what witnesses to call. And while Caprice did not talk to every witness that Mack wanted her to, he fails to explain which witnesses they were, what they would have testified to, or how their testimony would have swayed the jury. Mack bears the burden to show that the failure to call witnesses was an uninformed decision that was "not the result of strategy." *Sola-Morales v. State*, 300 Kan. 875, 888, 335 P.3d 1162 (2014).

Mack argues that Caprice's universal policy of refusing to subpoena trial witnesses conflicted with his interest in compelling "the attendance of witnesses who might be favorable to his defense." Yet as noted above, Mack does not show how any witness would have helped his defense. Essentially, Mack argues that he had a "valid and constitutionally guaranteed interest in compelling the attendance of witnesses and Ms. Caprice's illegitimate interest prevented [him] from doing so."

Caprice explained that she had a general policy not to subpoena witnesses for trial and she explained why. Mack finds this policy unreasonable. But even assuming that it may be so, we find no evidence that application of this policy adversely affected Mack's defense. Rather, as Caprice pointed out, most of the witnesses Mack referred to in the

35

justifiable dissatisfaction inquiry were already listed as State's witnesses, so their presence at trial was secured. Caprice could thus bring out any facts favorable to Mack's defense on cross-examination or recall them as a witness. And as for the one witness in Texas who might have testified to Sarah's prior bad acts, the district court denied Caprice's motion to admit her testimony. Thus, Mack fails to show that application of her policy caused her not to subpoena any witnesses that she should have called. Because he fails to meet his burden to show that Caprice's decision was uninformed and not the result of strategy, the district court did not err in finding that these were matters of trial strategy—the exclusive province of the lawyer. See *Turner*, 318 Kan. at 172; see also *State v. Burnett*, 300 Kan. 419, 450-51, 329 P.3d 1169 (2014) (defendant had not shown justifiable dissatisfaction or that complaints would be remedied by new counsel when complaints stemmed from defense counsel's refusal to investigate matters or call witnesses defendant considered important).

Nor does Mack show any harm to his defense through any application of Caprice's policy. See *Foster*, 290 Kan. at 709 (rejecting defendant's conflict of interest claim and approving court's colloquy with defendant and defense counsel in which counsel indicated he did not plan to call witnesses for defense because those available "'will hurt me'"). We find no abuse of discretion in the district court's determination that Caprice did not reveal a conflict of interest by telling the court that Mack objected to her policy of not subpoenaing witnesses.

> 4. *Caprice's statements about her decision not to admit good character evidence did not reveal a conflict of interest.*

Lastly, Mack argues that Caprice revealed a conflict of interest because she told the court she refused to present evidence of Mack's good character simply to prevent Mack's future claim of ineffective assistance of counsel against her. But Mack mischaracterizes Caprice's reasoning and explanation, as well as his good character.

36

Caprice explained to the court that she had told Mack that it would be "strategically" a "bad choice" to introduce evidence of his good character because it would "open[] the door to his other criminal activity," which she believed "would not be . . . in his best interest." Caprice stated facts that supported her conclusion—Mack had a pending methamphetamine case in this jurisdiction as well as a conviction which required the submission of his DNA. Her strategy was also legally well-founded. Mack's criminal history could not be admitted solely to impair his credibility unless he first introduced evidence admissible solely to support his credibility. See K.S.A. 60-421. But under K.S.A. 60-447, if the defendant opens the door by admitting evidence of his own good character, the State can introduce character evidence to prove defendant's guilt.

True, Caprice's explanation added that Mack would likely pursue an ineffective assistance of counsel claim against her on appeal if she introduced this evidence. But this was a reasonable assumption. See, e.g., *Stenberg v. State*, No. 123,438, 2022 WL 570830, at *5 (Kan. App. 2022) (unpublished opinion) (addressing K.S.A. 60-1507 motion alleging ineffective assistance of counsel for failing to investigate character witnesses who would have invited rebuttal evidence about Stenberg's past sexual misconduct); *Angelo v. State*, No. 109,660, 2014 WL 1096834, at *7 (Kan. App. 2014) (unpublished opinion) (addressing K.S.A. 60-1507 motion claiming trial counsel erred by allowing witness to testify about Angelo's good character, thereby opening the door to allow State to admit evidence of his prior criminal history).

And Caprice did not say that the reason she refused to present evidence of Mack's good character was *only* to prevent Mack's future claim of ineffective assistance of counsel against her. The context shows that she alluded to a future ineffective assistance of counsel claim to emphasize that it would be bad strategy to admit evidence of good character, thus opening the door for the State to introduce evidence of Mack's prior crimes. So even though Mack disagreed with Caprice's decision not to introduce good character evidence, the district court was correct to find that it was a matter of trial

strategy best left to Caprice's professional judgment. See, e.g., *Stenberg*, 2022 WL 570830, at *6 (finding attorney's decision not to pursue testimony of character witnesses reasonable given facts of the case, including Stenberg's history); *State v. Loring*, No. 106,763, 2013 WL 3455771, at *11 (Kan. App. 2013) (unpublished opinion) (finding attorney's decision to call character witness to show that Loring was not the type of person to rape someone, even though he believed there was risk for opening the door to Loring's criminal background, matter of trial strategy which is virtually unchallengeable upon appeal).

None of Mack's assertions show that Caprice had a conflict of interest that affected the quality of her representation to the point that the district court needed to appoint substitute counsel. A reasonable person could agree with the district court's view that Caprice had done substantial work investigating the case, had diligently tried to locate the witnesses, had made strategic decisions, and could "give effective aid to [Mack] in presenting a fair defense." We thus find that the district court did not abuse its discretion by denying Mack's motion to continue the trial to obtain substitute counsel.

D. *Replacement counsel would encounter the same conflict.*

But even assuming that Caprice had or created some conflict of interest in any of these matters, to find the district court abused its discretion in refusing to appoint substitute counsel, this court must first conclude that the district court's decision was one that no reasonable person could agree with. And that we cannot do. When considering the context in which Mack asked for this continuance, his complaints about his previous counsel, his prior last-minute requests for continuances, and the overall history of the proceedings, it was reasonable for the district court to conclude that even if it appointed substitute counsel, Mack's new counsel would likely encounter the same conflict or dilemma.

38

A district court may properly deny a motion for new counsel if a defendant's dissatisfaction with his attorney's representation "'emanates from a complaint that cannot be remedied or resolved by the appointment of new counsel—such that replacement counsel would encounter the same conflict or dilemma.'" *Turner*, 318 Kan. at 171. And the district court here made explicit findings that Mack was trying to delay the proceedings through "outbursts and . . . borderline obstructionist behavior." These findings are supported by substantial competent evidence; the district court noted the next morning—when Mack failed to appear on the second day of trial—that "[t]hroughout the history of this case, for the past two-plus years, Mr. Mack has had a history of not appearing [and] appearing late" and had "attempted to delay these proceedings numerous times" through various continuances and other disruptive behavior. During the two years after Mack was charged, he had made several requests to continue hearings and the trial moments before they were to start based on complaints with his attorneys—complaints that the court had told him were matters of trial strategy.

Thus, it was reasonable for the court to conclude that Mack's disruptive behavior would continue even if he got substitute counsel. A reasonable person could agree with the district court's decision not to appoint substitute counsel. And Mack has shown no error of law. The district court thus acted within its discretion.

E. *The voir dire incident is unpreserved.*

We briefly address one other incident. Mack mentions that during voir dire, Caprice and Mack got into a scuffle in the jury's presence.

After the district court had found that Mack failed to show justifiable dissatisfaction with Caprice's representation, it began selecting a jury. But the court was forced to pause jury selection several times because Mack "indicated that he was getting sick and left the courtroom, which disrupted the voir dire process." And even after he

39

returned, Mack began what the court said was "best describe[d] as, dry heaving in the courtroom," which caused another delay in the jury selection process.

A short time later, the court had to pause jury selection yet again after Caprice approached the bench to say that Mack had taken her work product, had refused to return it, and had pushed her arm away when she tried to get it. The court immediately ordered the parties into chambers. Caprice explained what had happened, and the court responded by telling the parties what he had seen and that he expected Mack and Caprice to act and speak respectfully.

We recognize that once a district court is alerted to the possibility of a conflict of interest between an attorney and her client, it has a continuing duty to ensure that the defendant receives effective representation. *State v. Brown*, 300 Kan. 565, 577, 331 P.3d 797 (2014). But Mack does not argue that this interaction created a conflict of interest, so he fails to properly raise this claim of error. See *State v. Logsdon*, 304 Kan. 3, 29, 371 P.3d 836 (2016) ("[A] failure to adequately brief an issue results in abandonment or waiver."). Mack abandoned the issue because he merely raised this point incidentally in his brief but did not argue it. See *State v. Gallegos*, 313 Kan. 262, 277, 485 P.3d 622 (2021). Mack thus fails to allege and to show that the district court abused its discretion by failing to appoint substitute counsel during jury selection.

III.     *Any Prosecutorial Error During Closing Argument Was Harmless*

In his final argument on appeal, Mack asserts that the prosecutor erred during closing argument by telling the jury that Mack's defense was about as reasonable as claiming "space aliens beamed down to planet earth and they committed the crime." He contends that this space aliens analogy essentially accused him of lying.

40

The appellate court uses a two-step process to evaluate claims of prosecutorial error: error and prejudice. *State v. Sieg*, 315 Kan. 526, 535, 509 P.3d 535 (2022). While prosecutors "enjoy wide latitude in crafting closing arguments," that latitude does not extend so far as to allow them to opine on the credibility of a defendant's testimony or the merits of his defense since such comments would be "'unsworn, unchecked testimony.'" *Brown*, 300 Kan. at 559, 560. A prosecutor may direct the jury's attention to specific evidence and rhetorically ask which version of events is more credible. *State v. Williams*, 303 Kan. 585, 603-04, 363 P.3d 1101 (2016). But a prosecutor cannot accuse the defendant of lying—either explicitly or through a thinly veiled euphemism. *Brown*, 300 Kan. at 560-61 (finding error when the prosecutor described the defendant's defense as a "fabrication," "tale," "story," and "yarn"); see *State v. Haygood*, 308 Kan. 1387, 1402, 430 P.3d 11 (2018).

Mack challenges this part of the prosecutor's closing argument:

"Because, as I say, for Mr. Mack's theory of defense to be plausible at all, that is that he did not do this, you have to negate that condom evidence because that is scientific evidence. His DNA is on that condom, inside and outside. And [Jane's] DNA is on that condom. And when you set aside what Mr. Mack is saying for just a second, that presents a very clear picture of who one of the two assailants was.

. . . .

"We would submit to you that that is not enough to raise a reasonable doubt, no more than to say space aliens beamed down to planet earth and they committed the crime."

The context shows that the prosecutor presented an evidence-based argument that the evidence met the burden of proof, rather than a person-based argument that Mack lacked credibility. Although the prosecutor could point to stark inconsistencies in Mack's defense, it was the duty of the jury, not the State, to decide whether Mack's defense was believable. *Duong*, 292 Kan. at 830 (jury must be left to draw conclusion about

41

credibility of witness). Still, in an abundance of caution, we assume without finding that the prosecutor's statement—that Mack's defense raised no more reasonable doubt than did a claim that space aliens committed the crime—exceeds the bounds of the wide latitude prosecutors have in crafting closing arguments.

We thus determine whether the error was harmless. Mack argues that this error was not harmless because his defense rested solely on his credibility, yet the prosecutor's calling Mack a liar tainted the jury's view of his credibility and of his defense.

Even so, we find any error harmless, as the State has shown "no reasonable possibility that the error contributed to the verdict." *State v. Fraire*, 312 Kan. 786, 792, 481 P.3d 129 (2021). Mack raised no objection during closing arguments to the space aliens analogy. And the jury heard detailed testimony from Jane about the physical and sexual assaults and the surrounding events—testimony that was consistent with what she had told police in 2003. The scientific evidence was unrefuted—Mack's DNA matched the DNA profile on the used condom found in 2003 on the bathroom floor, which also contained Jane's DNA. And the detective testified that Mack made inconsistent statements during the investigation—Mack had initially denied ever being at the house but later admitted that he had been there several times to have sex with Jane's sister and Sarah. And no witness substantially corroborated Mack's defense, either when speaking to the detective pretrial or during their trial testimony.

What is more, the jury was instructed that statements of counsel are not evidence and to disregard any statements unsupported by the evidence. The jurors were also instructed that it was up to them to determine the weight and credit to give each witness. And we generally presume that the jury has followed the instructions given by the trial court. See *State v. Gray*, 311 Kan. 164, Syl. ¶ 2, 459 P.3d 165 (2020) ("Kansas courts presume jury members follow instructions."). We presume that here.

42

We thus find that the State has met its burden to show no reasonable possibility that this error, if any, contributed to the verdict.

Affirmed.

\* \* \*

FOLSOM, J., dissenting: Defense counsel in this case—KiAnn Caprice—breached her duty of loyalty and created an actual conflict of interest with her client, Pernell Mack. Because Caprice openly advocated against Mack on more than one issue, he had justifiable dissatisfaction with her representation. In my view, the district court erred by denying Mack's request for new counsel. I would reverse Mack's convictions and remand for a new trial with an attorney who will be loyal to their client. Thus, I respectfully dissent.

Pernell Mack was a difficult client for the two lawyers that represented him in the district court. He had some of the same complaints with Caprice that he had with his first counsel. And there was evidence that he was trying to delay his jury trial, rather than go forward with Caprice at the helm. It is also clear from the record that Caprice and Mack did not get along very well. But even though he was difficult to deal with, Mack was entitled to zealous, conflict-free counsel.

This right to conflict-free counsel is guaranteed by the Sixth Amendment to the United States Constitution and section 10 of the Kansas Constitution Bill of Rights. *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981); *State v. Toothman*, 310 Kan. 542, 554, 448 P.3d 1039 (2019); *State v. Sharkey*, 299 Kan. 87, 96, 322 P.3d 325 (2014). In fact, the duty of loyalty is "'perhaps the most basic of counsel's duties.'" *Sola-Morales v. State*, 300 Kan. 875, 894, 335 P.3d 1162 (2014) (quoting *Strickland v. Washington*, 466 U.S. 668, 692, 104 S. Ct. 2052, 80 L. Ed. 2d 674 [1984]).

43

When a criminal defendant asks a district court for new counsel, the court need not do so unless it finds, after an initial inquiry, that a defendant has established "justifiable dissatisfaction with his or her current attorney." *State v. Pfannenstiel*, 302 Kan. 747, 765, 357 P.3d 877 (2015). To demonstrate justifiable dissatisfaction, the defendant must show a conflict of interest, an irreconcilable disagreement, or a complete breakdown in communication between counsel and the defendant. 302 Kan. at 759-60.

An actual conflict of interest exists when an attorney is put in a position where divided loyalty is likely, "and can include situations in which the caliber of an attorney's services 'may be substantially diluted.'" 302 Kan. at 758. Ultimately, "[c]onflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case." 302 Kan. at 758; see also *State v. Prado*, 299 Kan. 1251, 1258, 329 P.3d 473 (2014). Under *United States v. Cronic*, 466 U.S. 648, 658-59, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984), a complete or constructive denial of counsel at a critical stage of a proceeding presents an actual conflict of interest for which prejudice is presumed. *Sharkey*, 299 Kan. at 100-01.

During a court's inquiry into a defendant's request for new counsel, the court and defense counsel must walk a *delicate line* on the issue of justifiable dissatisfaction. *Pfannenstiel*, 302 Kan. at 766. Thus, a judge must explore the basis of the dissatisfaction or alleged conflict "'without improperly requiring disclosure of the confidential communications of the client.'" 302 Kan. at 766 (quoting *Holloway v. Arkansas*, 435 U.S. 475, 487, 98 S. Ct. 1173, 55 L. Ed. 2d 426 [1978]). During this inquiry, defense counsel is allowed to truthfully recount facts—but they may not go beyond factual statements, and they cannot advocate against their client's position. 302 Kan. at 766 (citing *United States v. McKenna*, 327 F.3d 830, 843-44 [9th Cir. 2003]).

Here, Mack requested new counsel based on his dissatisfaction with Caprice. The court attempted to walk the "delicate line" during its inquiry into the request. See 302

Kan. at 766. But Caprice made no such attempt. Caprice openly advocated against Mack on more than one issue, creating an actual conflict of interest that resulted in a constructive denial of counsel at a critical stage of a proceeding—Mack's jury trial. Thus, the district court should have granted Mack's request for new counsel.

FACTUAL AND PROCEDURAL HISTORY

The majority details the history of Mack's case, as well as Mack's requests for Caprice to investigate or interview specific witnesses. This analysis may usually be required for a request for new counsel based on dissatisfaction with counsel's strategy or investigation. But Caprice's direct accusations and advocacy against Mack make the analysis less nuanced. Some factual context is necessary—but the important details are Caprice's openly adversarial positions to Mack during the court's inquiry and throughout the rest of the proceedings.

*Mack requested a continuance at the final pretrial conference.*

Caprice's documented conflict with Mack began about 30 days before trial. At the final pretrial hearing, Mack asked the court to continue his jury trial to allow more time to locate and interview witnesses. The State objected. The majority notes this request by Mack—but importantly, Caprice was vocally opposed to Mack's request.

Caprice told the court:

"I hope I was clear in indicating my client is asking for that continuance. I am not. That's why I'm making an oral request. We do have a trial date 30 days out and if my client remains cooperative in this continued investigation, then he's requesting the trial, you know, could maybe proceed, or even the case be dismissed, is his hope."

45

During this hearing, Mack also identified witnesses he wanted Caprice to interview. The district court denied the motion and noted that the case had been pending for two years and absent "extraordinary circumstances," the court was not going to continue the trial.

*Mack requested new counsel at trial.*

On the first morning of the trial, Caprice informed the district court that Mack was dissatisfied with her representation and that he had reached out to another attorney to represent him. This other attorney was named to the court and was allegedly willing to enter his appearance that day. Caprice explained that she was "ethically bound to ask the Court for a continuance so [Mack] can have the attorney of his choice."

Caprice explained Mack's complaints with her representation. One complaint was that she had not talked to all his witnesses. She also did not subpoena any witnesses for the trial. Finally, she had refused to present certain good-character evidence in his defense.

On the issue of subpoenas, Caprice explained to the court that she never subpoenas witnesses to testify at trial. She stated:

> "My strategy has been for a long time, that especially in a case such as this, that if somebody is not willing to come in voluntarily, that I'm not going to throw them in jail to come testify because it's very likely their testimony would not be favorable if they were sitting in jail for a number of days waiting to testify."

But Mack did not agree with this blanket waiver of his right to compulsory process.

46

After Caprice discussed these issues, the court took a 10-minute recess to allow Caprice and Mack to speak privately. After the recess, the parties met in chambers so the court could conduct its inquiry into Mack's request.

During this inquiry, Caprice told the court that Mack had just told her that over the weekend, he had secured contact information for all the witnesses he wanted her to talk to. But Caprice clarified that Mack had not actually given her the contact information yet.

*Caprice violated her duty of loyalty to Mack.*

Moments later in this in-chambers hearing—with the prosecutor present—Caprice volunteered to the court that Mack had just told her that he had secretly recorded a private conversation she had with the prosecutor. Caprice disclosed this attorney-client conversation as follows:

> "[T]he . . . second to the last time we were in the courtroom, I did ask him to exit the courtroom so I could speak with the prosecutor about another case. [Mack] indicates that he secretly recorded that conversation by standing outside of the courtroom. He is refusing—he has it on his phone. He is refusing to let me listen to that to see if there's some kind of conflict or something we need to address."

Caprice then asked the court to have law enforcement seize and search Mack's phone for evidence of this conduct:

> "I'm asking the deputy to take custody of that phone. If this is an issue that he wants brought up, let's bring it up. I'm asking the deputy to take the phone to find that recording, and let's hear it if there's a complaint."

47

But Mack did not bring up this topic to the court. He also did not authorize Caprice to disclose this part of their attorney-client conversation, nor did he expressly or impliedly authorize Caprice to discuss this issue with the court.

The court then questioned Mack about this alleged recording, with Caprice continuing as Mack's accuser:

"THE COURT: Yes.

"You made a secret recording at some point; correct?

"DEFENDANT MACK: Yes, sir. What I'm saying—

"THE COURT: No. I'm asking the questions now. You made a secret recording without your lawyer's knowledge?

"MS. CAPRICE: Without anybody who was having the conservation [*sic*]. Nobody who was having the conservation [*sic*] had any idea they were being recorded.

"DEFENDANT MACK: That's not true. I was outside of the courtroom and I was on—what I mean by a recording, I was outside of the courtroom and she—what my complaint was, why I was so upset was, because when she sent me out of the courtroom, she didn't say, Mr. Mack, can you leave the courtroom because I have some other things to speak about. What she said was, pointing, 'I'll be out there to talk to you. Woo, woo, woo, woo, woo.' When she said that, I immediately walked out like she ordered me to do. I got onto my phone. I said—because my pregnant girl was here with me. I told her, 'Look. Come up. She's ordered me out of the courtroom,' because I had already talked about this with [the private investigator]—

"THE COURT: Mr. Mack, my question is, did you make a secret recording of a courtroom proceeding?

"DEFENDANT MACK: No, not of a courtroom proceeding. No, I did not."

The court then questioned Mack about Caprice's allegation that he had recorded a conversation between the attorneys. Mack denied this allegation and started to explain, when Caprice interjected: "The Judge is asking if you have a recording."

The court then asked again if Mack had made a "recording of the attorneys . . . or of me that we were unaware of." Mr. Mack explained that he had recordings of how Caprice had been treating him. The following exchange continued:

> "THE COURT: Okay. And we'll get to that in a minute. But my very specific question is, your lawyer just represented that after a hearing we had previous, that she asked you to leave the courtroom so she could have a discussion with one of the other attorneys regarding a different matter, and she indicated to the Court that you stood by the door and recorded that.
>
> "DEFENDANT MACK: No, I didn't record it.
>
> "THE COURT: So you're telling me no recording exists; correct?
>
> "DEFENDANT MACK: No, sir. No recording exists of that. What I'm saying, I have recording on record of her mishandling me and me—
>
> "THE COURT: In the courtroom?
>
> "DEFENDANT MACK: Yes. Not just in the courtroom, no.
>
> "THE COURT: Why are you recording stuff in the courtroom? That's a violation of—
>
> "DEFENDANT MACK: I'm not saying I recorded in the courtroom."

The court then questioned Mack a bit more—but the focus shifted to Mack's requests to continue the trial and to hire new counsel. Mack told the court that he wanted to hire another lawyer because of the way Caprice was "handling me and handling . . . the information I'm giving her." The court then asked the prosecutor to leave so it could further inquire into Mack's complaints with Caprice.

*The court inquired into Mack's dissatisfaction with Caprice.*

Once the prosecutor left the in-chambers hearing, the court told Mack "[n]ow is your opportunity to explain" the conflict with Caprice. The court stated that "I'm not going to interrupt you. I want you to explain" why "I should remove Ms. Caprice as your

49

lawyer." The court then informed Mack that specific defense strategy was not necessary and that the conversations he had with counsel were privileged.

Mack stated that he was unhappy because of "the way that [Caprice was] handling me, the way she's handling the information that I'm giving her, and . . . a lot of this stuff . . . is being done last minute." Mack said that he had given Caprice the names of these witnesses months before, but that she was only now trying to contact them. Mack also expressed frustration over Caprice's decision on the use of character evidence involving the State's key witness. Mack then stated that Caprice had been "very rude" to him. He alleged that Caprice had been unprofessional in numerous ways and that Caprice was treating his concerns too "nonchalantly."

Mack also complained that Caprice refused to put on good-character evidence in his defense. Regarding the witnesses, Mack stated that "all the names are being said wrong. They are being spelled wrong. Because she really doesn't even care, to be honest with you." He claimed that "she is not with me and she could care less about getting the truth." Mack concluded by stating that he felt like the way Caprice was treating him made him feel like he was "on trial with her as well."

*Caprice volunteered an adversarial response to Mack's claims.*

The court did not ask Caprice to respond—but Caprice asked to do so anyway. Caprice then advocated against Mack's request for new counsel. Near the outset of her argument, Caprice stated that she frequently informed clients that she is "not their friend . . . [,] not their mother, their girlfriend, their pastor, their *counselor*," rather she is there "to do a job for them to the best of [her] ability." (Emphasis added.) She said her demeanor is often misinterpreted by those clients who are misogynistic:

50

"I will say that personality of mine and the way that I am serious, oftentimes, mostly by male clients, is interpreted as being rude. I do feel as if that is a somewhat misogynistic feeling that they get because they expect something different from a female attorney."

Caprice also volunteered that Mack had missed five scheduled appointments with her and that there were multiple instances where he had not returned his "homework." Again, the court did not ask Ms. Caprice for this information. She volunteered it.

Instead of Caprice interviewing alibi witnesses, she explained that she had Mack talk to the State's lead detective and had the detective go interview the witnesses. Then, the witnesses became State witnesses. Caprice also stated that some of the witnesses Mack suggested were only brought to her attention over the weekend. And Caprice discussed how she thought presenting Mack's character evidence was a bad idea because of his prior felony drug conviction.

Regarding Mack's request to retain new counsel, Caprice stated that she told Mack that "he is certainly welcome" to retain other counsel, but that it would be unlikely that the court would grant a continuance to allow him to "maybe" retain new counsel. So she told him he "needs to be prepared [to] cooperate with [her] during trial."

Finally, Caprice addressed Mack's complaint that "he has a conflict with [her]." She advocated against this claim:

"Finally, I guess I would want to address his claim that he has a conflict with me. I do not have one with Mr. Mack. It is not uncommon for clients facing such a serious case on the eve or the morning of trial to—the analogy I use is, I like to watch the horse races and you see the horses all jittery and nervous as they are getting up to get into the gate for the race. This is not uncommon.

51

"I do not take personal offense to anything he's saying. I am confident in the work that I've done. I have the backup of a private investigator in this case, who's done a lot of work. I do not take personal anything Mr. Mack has said. I'm prepared to try this case.

"I'm not asking to withdraw. The Court made it clear when I was appointed that this case is going to trial. The Court did make it clear that when we picked a trial date, that it was far enough out that the Court was not going to allow me to come forward, absent some unforeseen circumstance, and claim that I was unprepared. I am prepared."

The court did not inquire further of Mack. At no point did the court ask Mack if he was comfortable going forward with Caprice given her earlier breach of confidentiality, the accusations she made against him, her request to search Mack's phone, or her express opposition to his requests.

*The court denied Mack's request for new counsel.*

The court invited the State back into the in-chambers hearing. The State opposed Mack's motion for continuance to obtain new counsel, arguing that it believed this request was "not made in good faith" because it believed Mack "does not want his trial to ever happen."

The district court then denied Mack's request to obtain new counsel, finding Mack failed to show justifiable dissatisfaction with Caprice. The court found that all Mack's complaints with Caprice were matters of trial strategy and there was "no reason" to believe that the "attorney/client relationship has deteriorated to the point where new counsel is warranted." The court ultimately found that Caprice had "done her duty, ha[d] made strategic decisions, and [could] give effective aid to [Mack] in presenting a fair defense."

52

*There were additional conflicts and breaches of confidentiality during the trial.*

Later in the day, Caprice got into an altercation with Mack during jury selection. Caprice approached the bench, with the jury in the courtroom, and stated "I'm not going to get into a physical altercation in front of the jury with my client. He has taken work product. He is not returning it. I need what he has and he pushed my arm away when I tried to get it."

The parties then went into chambers, and Caprice stated that the altercation stemmed from a note she wrote to Mack about contact with a potential witness. Mack grabbed the note and would not give it back to her. Caprice then inexplicably told the court the content of the attorney-client communication—that she heard back from a witness on Mack's list, and the response was "LOL." Caprice more fully stated:

"I needed to write Mr. Mack a note regarding I had received a response from one of the witnesses he wanted me to contact. I don't have that name here. It was the last name on the list. Not anybody that was family members or the mother to his child. The response from that witness was, 'LOL,' L-O-L. I don't know—basically, it says that Mr. Mack had never contacted him and he has no idea what this is about. So I needed to let Mr. Mack know that that's one of the witnesses, that's the issue about whether or not they are going to come to court.

"When I reached for the notebook, Mr. Mack would not let me just write that note. When I went to try to get the notebook, he pushed my arm away and tore a page out of the notebook and he will not give it back to me.

"So I'm not going to get into a physical altercation in front of the jury. I'm not going to have Mr. Mack getting physical with me, like he already did in front of the jury. He has no right to touch me. We can write notes back and forth. I am not making any allegation of any crime. I need the note that he won't return to me."

The court had observed the altercation and ordered Mack to give the written communication back to Caprice. Caprice then marked the written communication as an

exhibit and entered the communication into the record "for appellate purposes only." There is no indication that Mack consented to the disclosure of yet another attorney-client communication. Caprice also did not explain why it was necessary to mark this attorney-client communication as an exhibit for the record and did not explain how this communication served any legitimate purpose in defense of Mack.

The court then commented that there had now been multiple disruptions of the trial, and Mack could forfeit his right to be present if he kept this up. The court warned the parties:

"And I'm going to be very blunt. Mr. Mack, and Ms. Caprice, I'm directing that in your direction mostly. So I'm aware of what happened this morning. I made my ruling. The two of you are going to work together. We're having a trial and that's what's going to happen. So any questions?"

The court did not inquire further into this conflict. The court instead stated to Mack:

"We are going to not have disruptions. One way or the other, this trial is going forward and I want you to be here. You deserve to be here. You have a right to be here. You do not have a right to disrupt these proceedings and I will remedy that one way or the other."

The court explained to Mack that he could waive his right to be present through his conduct. This all occurred near the end of the first day of trial.

The next day, Mack did not appear for trial. The court asked Caprice if she knew where her client was. Once again, Caprice disclosed an attorney-client communication that was adverse to her client. Caprice read the court a text message she had sent Mack

word-for-word, asking if he was at the courthouse. She then informed the court that Mack did not respond, and he was not present.

The court then ordered that they would proceed with the trial without Mack in attendance. Caprice thereafter gave no opening statement, conducted only limited cross-examination (she did not cross-examine the alleged victim), presented no evidence or witness testimony for Mack, and then gave a very sparce closing argument. In fact, Caprice's closing argument was just over *one page* of transcript and concluded with the following statement:

> "Your deliberation should not take long. Either you believe the evidence as presented by the State, or you believe my client's theory. Once that domino falls, the rest should fall in place as well, fairly quickly, and that will determine your verdict on all counts. Thank you."

For comparison, Caprice's earlier argument against Mack's request for new counsel was approximately 10 pages of trial transcript.

DISCUSSION

*Caprice did not walk the delicate line required of defense counsel during the court's inquiry into the conflict of interest.*

When Mack asked to hire his own new counsel and explained his dissatisfaction with Caprice, this triggered the district court's duty to inquire into the conflict of interest. See *Pfannenstiel*, 302 Kan. at 760. The court attempted to walk the "delicate line" required of the court and defense counsel in these situations—but Caprice made no such attempt. See 302 Kan. at 766.

During the inquiry, Caprice went beyond truthfully recounting facts to the court—she openly advocated against Mack's position. See 302 Kan. at 766. On the substantive trial issues, Caprice volunteered that Mack had missed five scheduled appointments with her and that there were multiple instances where he had not returned his "homework." The court did not ask Ms. Caprice for this information. She volunteered it.

Caprice also argued to the court that "I would want to address his claim that he has a conflict with me. I do not have one with Mr. Mack." But her adversarial statement on this legal issue and her other statements to the court proved otherwise.

Caprice repeatedly disclosed confidential communications with Mack and made statements that were against Mack's interests. The prime example was when Caprice accused Mack of making a secret recording of her conversation with the prosecutor in the courtroom, assisted the court in interrogating him about this, and then asked the court to have law enforcement search his phone for evidence of the recording.

Mack alleges on appeal that Caprice accused him of the crime of breach of privacy. The majority notes that Caprice technically did not accuse Mack of the crime of breach of privacy under K.S.A. 21-6101(a)(3) or (a)(4)—in part because a courtroom is not a "private place" under the statute. But Mack was not allowed to record anything in the courtroom with his cellphone. This was stated by the district court during the exchange with Mack, and the alleged conduct was at least a violation of the court's rules. See Supreme Court Rule 1001(d)(1) (2024 Kan. S. Ct. R. at 644) ("A person is prohibited from using a cell phone or any other electronic device in a court facility to . . . [m]ake sound recordings."); Third Judicial District, Shawnee County District Court Rule DCR 3.120 ("All cellular telephones, pagers, two-way radios, computers and other electronic communication devices must be turned off inside courtrooms unless otherwise authorized by the presiding judge.").

56

So perhaps Caprice only accused Mack of directly violating a court rule or only proffered facts to the court that would get Mack's cellphone confiscated. See Supreme Court Rule 1001(d)(2) (2024 Kan. S. Ct. R. at 644) ("Violating this rule may result in the device being confiscated."). Either way—Caprice was directly adversarial to her client.

Caprice failed in almost every way to walk the "delicate line" required of defense counsel during the court's inquiry into the conflict of interest. See *Pfannenstiel*, 302 Kan. at 766. Because of this failure, Caprice had an actual conflict of interest with Mack. And the district court erred in denying Mack's request to obtain new counsel. The court's decision was both legally erroneous under the applicable caselaw and sufficiently unreasonable to warrant

*Caprice abandoned her duty of loyalty to Mack.*

Caprice's actual conflict of interest with Mack was present throughout the entire trial. "Conflict of interest and divided loyalty situations can take many forms, and whether an actual conflict exists must be evaluated on the specific facts of each case." 302 Kan. at 758. An actual conflict of interest "can include situations in which the caliber of an attorney's services 'may be substantially diluted.'" 302 Kan. at 758.

Under the specific facts of this case, Caprice abandoned her role as an advocate, constructively denying Mack's right to counsel at the trial. See *Cronic*, 466 U.S. at 658-59. This resulted in an actual conflict of interest, for which prejudice is presumed. *Sharkey*, 299 Kan. at 100-01. But prejudice is also apparent in the record.

Caprice was constitutionally required to zealously defend Mack. Instead, she gave the court negative information about him, and the information came from privileged attorney-client communications. Caprice used some of this information as part of a request to have law enforcement search Mack's phone—the device in which Mack had

57

taken notes related to his case. The search did not occur—but the request alone violated Caprice's duty of loyalty to Mack. At the very least, these facts demonstrate that Caprice provided "substantially diluted" representation. See *Pfannenstiel*, 302 Kan. at 758.

The majority points out that Mack was difficult to work with and separately analyzes each of Mack's complaints to conclude that Mack did not have a conflict of interest with Caprice. But the opinion understates the cumulative nature of Caprice's adversarial positions to Mack, which were present throughout the trial.

Even after the court denied the request for new counsel, Caprice subsequently accused Mack of taking her property without permission by aggressively touching her in front of the jury (arguably the crime of battery). And she disclosed two more attorney-client communications that were directly adverse to Mack. This included Caprice placing into the record her handwritten message to Mack that his purported witness responded with the statement "'LOL.'" And it included Caprice reading into the record the text message on the second day of trial in which she asked Mack whether he was coming to court, to which he did not respond. Both messages were privileged communications, and both were disclosed by Caprice without permission and were adverse to Mack.

Generally, district courts have wide discretion in determining when a high-conflict defendant gets new counsel based on disagreement with counsel. But even a high-conflict defendant is entitled to a lawyer who does not accuse them of wrongful conduct, refer to them as misogynistic, ask law enforcement to search their property for evidence, and repeatedly violate the duty of confidentiality for no possible benefit to them. In short, even a defendant who is hard to deal with deserves an attorney who is loyal. See *Sola-Morales*, 300 Kan. at 894.

In my view, Caprice violated her duty of loyalty to Mack and wholly abandoned her role as his advocate. This was apparent at the time the district court made its ruling,

and it became more apparent as the trial went on. This actual conflict of interest resulted in a constructive denial of counsel at Mack's jury trial. See *Cronic*, 466 U.S. at 658-59. Prejudice is both presumed and apparent in the record. Because there was an actual conflict of interest, the district court erred in denying Mack's request to obtain new counsel. See *Sharkey*, 299 Kan. at 100-01. I would reverse Mack's convictions and remand for a new trial with an attorney who will be loyal to their client.